# EXHIBIT A

| | |
|---|---|
| **Name And Address Of Plaintiff 1**<br>Christopher Alloways-Ramsey<br>c/o Lanier Law Group, P.A.<br>6518 Airport Center Drive<br>Greensboro NC 27409 | In The General Court Of Justice<br>☐ District ☒ Superior Court Division |

FILED

2021 SEP 29 A 10: 50

FORSYTH CO., C.S.C.

*Kim Willoughby*

**GENERAL CIVIL ACTION COVER SHEET**

☒ INITIAL FILING ☐ SUBSEQUENT FILING

| **Name And Address Of Plaintiff 2**<br>Mary Sloan Gilliam<br>c/o Lanier Law Group, P.A.<br>6518 Airport Center Drive<br>Greensboro NC 27409 |
|---|

Rule 5(b) of the General Rules of Practice for the Superior and District Courts

**VERSUS**

| **Name And Address Of Defendant 1**<br>Jane Elizabeth Milley, individually and in her official capacity,<br>800 Nevin Road<br>South Weymouth, MA 02190 | **Name And Address Of Attorney Or Party, If Not Represented**<br>(complete for initial appearance or change of address)<br>Lisa Lanier<br>Lanier Law Group, P.A.<br>6518 Airport Center Drive<br>Greensboro NC 27409 |
|---|---|

| **Summons Submitted**<br>☒ Yes ☐ No | Telephone No.<br>(336) 506-1041 | Cellular Telephone No. |
|---|---|---|

| **Name And Address Of Defendant 2**<br>Larry Alan Smith<br>39 Saxon Woods<br><br>Avon CT 06001 | NC Attorney Bar No.<br>19119 | Attorney Email Address<br>llanier@lanierlawgroup.com |
|---|---|---|

☒ Initial Appearance in Case ☐ Change of Address

| **Summons Submitted**<br>☒ Yes ☐ No | Name Of Firm<br>Lanier Law Group, P.A. | Fax No.<br>866-905-8741 |
|---|---|---|

Counsel For
☒ All Plaintiffs ☐ All Defendants ☐ Only: *(list party(ies) represented)*

☒ Jury Demanded In Pleading ☐ Complex Litigation ☐ Stipulate to Arbitration

## TYPE OF PLEADING

*(check all that apply)*

☐ Amend (AMND)
☐ Amended Answer/Reply (AMND-Response)
☐ Amended Complaint (AMND)
☐ Assess Costs (COST)
☐ Answer/Reply (ANSW-Response) *(see Note)*
☐ Change Venue (CHVN)
☒ Complaint (COMP)
☐ Confession Of Judgment (CNFJ)
☐ Consent Order (CONS)
☐ Consolidate (CNSL)
☐ Contempt (CNTP)
☐ Continue (CNTN)
☐ Compel (CMPL)
☐ Counterclaim (CTCL) *Assess Court Costs*
☐ Crossclaim (list on back) (CRSS) *Assess Court Costs*
☐ Dismiss (DISM) *Assess Court Costs*
☐ Exempt/Waive Mediation (EXMD)
☐ Extend Statute Of Limitations, Rule 9 (ESOL)
☐ Extend Time For Complaint (EXCO)
☐ Failure To Join Necessary Party (FJNP)

☐ Failure To State A Claim (FASC)
☐ Implementation Of Wage Withholding In Non-IV-D Cases (OTHR)
☐ Improper Venue/Division (IMVN)
☐ Including Attorney's Fees (ATTY)
☐ Intervene (INTR)
☐ Interplead (OTHR)
☐ Lack Of Jurisdiction (Person) (LJPN)
☐ Lack Of Jurisdiction (Subject Matter) (LJSM)
☐ Modification Of Child Support In IV-D Actions (MSUP)
☐ Notice Of Dismissal With Or Without Prejudice (VOLD)
☐ Petition To Sue As Indigent (OTHR)
☐ Rule 12 Motion In Lieu Of Answer (MDLA)
☐ Sanctions (SANC)
☐ Set Aside (OTHR)
☐ Show Cause (SHOW)
☐ Transfer (TRFR)
☐ Third Party Complaint (list Third Party Defendants on back) (TPCL)
☐ Vacate/Modify Judgment (VCMD)
☐ Withdraw As Counsel (WDCN)
☐ Other *(specify and list each separately)*

**NOTE:** *All filings in civil actions shall include as the first page of the filing a cover sheet summarizing the critical elements of the filing in a format prescribed by the Administrative Office of the Courts, and the Clerk of Superior Court shall require a party to refile a filing which does not include the required cover sheet. For subsequent filings in civil actions, the filing party must include either a General Civil (AOC-CV-751), Motion (AOC-CV-752), or Court Action (AOC-CV-753) cover sheet.*

(Over)

AOC-CV-751, Rev. 3/19, © 2019 Administrative Office of the Courts

## CLAIMS FOR RELIEF

- ☐ Administrative Appeal (ADMA)
- ☐ Appointment Of Receiver (APRC)
- ☐ Attachment/Garnishment (ATTC)
- ☐ Claim And Delivery (CLMD)
- ☐ Collection On Account (ACCT)
- ☐ Condemnation (CNDM)
- ☐ Contract (CNTR)
- ☐ Discovery Scheduling Order (DSCH)
- ☐ Injunction (INJU)

- ☐ Limited Driving Privilege - Out-Of-State Convictions (PLDP)
- ☐ Medical Malpractice (MDML)
- ☐ Minor Settlement (MSTL)
- ☐ Money Owed (MNYO)
- ☐ Negligence - Motor Vehicle (MVNG)
- ☒ Negligence - Other (NEGO)
- ☐ Motor Vehicle Lien G.S. Chapter 44A (MVLN)
- ☐ Possession Of Personal Property (POPP)

- ☐ Product Liability (PROD)
- ☐ Real Property (RLPR)
- ☐ Specific Performance (SPPR)
- ☐ Other (specify and list each separately)

| Date | Signature Of Attorney/Party |
|---|---|
| 9/29/21 | |

**FEES IN G.S. 7A-308 APPLY**
Assert Right Of Access (ARAS)
Substitution Of Trustee (Judicial Foreclosure) (RSOT)
Supplemental Procedures (SUPR)

**PRO HAC VICE FEES APPLY**
Motion For Out-Of-State Attorney To Appear In NC Courts In A Civil Or Criminal Matter (Out-Of-State Attorney/Pro Hac Vice Fee)

| No. | ☒ Additional Plaintiff(s) | | |
|---|---|---|---|
| 3 | Elizabeth Johnson | | |
| 4 | Heidi Rayher | | |
| 5 | Terence Steiner | | |
| 6 | Elizabeth Wilson | | |
| 7 | Christopher Soderlund | | |

| No. | ☒ Additional Defendant(s) ☐ Third Party Defendant(s) | Summons Submitted |
|---|---|---|
| 3 | Peggy Dodson    No. 8 - University of North Carolina School of the Arts | ☒ Yes ☐ No |
| 4 | William Tribby | ☒ Yes ☐ No |
| 5 | Dianne Markham | ☒ Yes ☐ No |
| 6 | Alan Rust | ☒ Yes ☐ No |
| 7 | Richard Gain | ☒ Yes ☐ No |

*Plaintiff(s) Against Whom Counterclaim Asserted*

*Defendant(s) Against Whom Crossclaim Asserted*

AOC-CV-751, Side Two, Rev. 3/19
© 2019 Administrative Office of the Courts

## STATEMENT OF CHRISTOPHER SODERLUND

FILED

' 2021 SEP 29 A 10: 59

FORSYTH CO., C.S.C.

BY *Kim Willoughby*

I, Christopher Soderlund, Plaintiff, state as follows:

1.      My address is 3008 West Grace Street, Boise, Idaho 83703.

2.      I have retained Gloria R. Allred, Nathan Goldberg and Renee Mochkatel with the law

firm of Allred, Maroko & Goldberg, 6300 Wilshire Boulevard, Suite 1500, Los Angeles, CA

90048, to represent me in the above-captioned matter and have agreed to the association of Lisa

Andrews-Lanier, Donald S. Higley, II and Robert O. Jenkins, with the firm of Lanier Law

Group, P.A., 4915 Piedmont Parkway, Suite 104, Jamestown, North Carolina, 27282, for

purposes of allowing Gloria R. Allred, Nathan Goldberg and Renee Mochkatel to appear in this

Court as Plaintiff's counsel.

This the 24 day of September, 2021.

Christopher Soderlund

# STATEMENT OF TERENCE STEINER

FILED

' 2021 SEP 29 · A 10: 58

FORSYTH WV 65.70 C. S. C.

ex Kim Willoughby

I, Terence Steiner, Plaintiff, state as follows:

1.     My address is 699 Whitaker Boulevard West, Unit 302, Huntington, WV 65702.

2.     I have retained Gloria R. Allred, Nathan Goldberg and Renee Mochkatel with the

law firm of Allred, Maroko & Goldberg, 6300 Wilshire Boulevard, Suite 1500,

Los Angeles, CA 90048, to represent me in the above-captioned matter and have

agreed to the association of Lisa Andrews-Lanier, Donald S. Higley, II and

Robert O. Jenkins, with the firm of Lanier Law Group, P.A., 4915 Piedmont

Parkway, Suite 104, Jamestown, North Carolina, 27282, for purposes of allowing

Gloria R. Allred, Nathan Goldberg and Renee Mochkatel to appear in this Court

as Plaintiff's counsel.

This the 27 day of September, 2021.

Terence Steiner

## STATEMENT OF CHRISTOPHER ALLOWAYS-RAMSEY

FILED
2021 SEP 29 A 10:58
FORSYTH CO., C.S.C.
Kim Willoughby

I, Christopher Alloways-Ramsey, Plaintiff, state as follows:

1.  My address is 1935 S. Douglas Street #10, Salt Lake City, Utah 84105.

2.  I have retained Gloria R. Allred, Nathan Goldberg and Renee Mochkatel with the

    law firm of Allred, Maroko & Goldberg, 6300 Wilshire Boulevard, Suite 1500,

    Los Angeles, CA 90048, to represent me in the above-captioned matter and have

    agreed to the association of Lisa Andrews-Lanier, Donald S. Higley, II and

    Robert O. Jenkins, with the firm of Lanier Law Group, P.A., 4915 Piedmont

    Parkway, Suite 104, Jamestown, North Carolina, 27282, for purposes of allowing

    Gloria R. Allred, Nathan Goldberg and Renee Mochkatel to appear in this Court

    as Plaintiff's counsel.

This the 21 day of September, 2021.

Christopher Alloways-Ramsey

State of _____
County of _____
Subscribed and sworn to (or affirmed) before ___
_____ day of _____
By_____
Personally known _____ OR produced identification _____
Type identification produced _____

Notary

State of UTAH
County of SALT LAKE
Subscribed and sworn to (or affirmed) before me this
25TH day of SEPTEMBER 2021
By CHRISTOPHER DAVID ALLOWAYS-RAMSEY
Personally known _____ OR produced identification ✓
Type identification produced FLORIDA DRIVER LICENSE

Joseph Notary Public

JOSEPH ANTHONY WILLIAMS
Notary Public - State of Utah
Commission # 712699
My Commission Expires
June 23, 2024

# STATEMENT OF ELIZABETH JOHNSON

FILED

' 2021 SEP 29 A 10: 58

FORSYTH CO., C.S.C.

By: Kim Willoughby

I, Elizabeth Johnson, Plaintiff, state as follows:

1.  My address is 900 SW 62nd Blvd. F36, Gainesville, Florida 32607.

2.  I have retained Gloria R. Allred, Nathan Goldberg and Renee Mochkatel with the

    law firm of Allred, Maroko & Goldberg, 6300 Wilshire Boulevard, Suite 1500,

    Los Angeles, CA 90048, to represent me in the above-captioned matter and have

    agreed to the association of Lisa Andrews-Lanier, Donald S. Higley, II and

    Robert O. Jenkins, with the firm of Lanier Law Group, P.A., 4915 Piedmont

    Parkway, Suite 104, Jamestown, North Carolina, 27282, for purposes of allowing

    Gloria R. Allred, Nathan Goldberg and Renee Mochkatel to appear in this Court

    as Plaintiff's counsel.


This the 23rd day of September, 2021.

Elizabeth Johnson

## STATEMENT OF MARY SLOAN GILLIAM

FILED

2021 SEP 29 A 10: 58

FORSYTH CO., C.S.C.

*Kim Willoughby*

I, Mary Sloan Gilliam, Plaintiff, state as follows:

1.      My address is 20 Grace Lane, Mount Pleasant, South Carolina 29465.

2.      I have retained Gloria R. Allred, Nathan Goldberg and Renee Mochkatel with the

law firm of Allred, Maroko & Goldberg, 6300 Wilshire Boulevard, Suite 1500,

Los Angeles, CA 90048, to represent me in the above-captioned matter and have

agreed to the association of Lisa Andrews-Lanier, Donald S. Higley, II and

Robert O. Jenkins, with the firm of Lanier Law Group, P.A., 4915 Piedmont

Parkway, Suite 104, Jamestown, North Carolina, 27282, for purposes of allowing

Gloria R. Allred, Nathan Goldberg and Renee Mochkatel to appear in this Court

as Plaintiff's counsel.

This the ⎯23⎯ day of September, 2021.

_____
Mary Sloan Gilliam

## STATEMENT OF HEIDI RAYHER

FILED

' 2021 SEP 29 A 10: 58

FORSYTH CO., C.S.C.

By *Kim Willoughby*

I, Heidi Rayher, Plaintiff, state as follows:

1.  My address is 3218 Madison Street, Alameda, California 94501.

2.  I have retained Gloria R. Allred, Nathan Goldberg and Renee Mochkatel with the law firm of Allred, Maroko & Goldberg, 6300 Wilshire Boulevard, Suite 1500, Los Angeles, CA 90048, to represent me in the above-captioned matter and have agreed to the association of Lisa Andrews-Lanier, Donald S. Higley, II and Robert O. Jenkins, with the firm of Lanier Law Group, P.A., 4915 Piedmont Parkway, Suite 104, Jamestown, North Carolina, 27282, for purposes of allowing Gloria R. Allred, Nathan Goldberg and Renee Mochkatel to appear in this Court as Plaintiff's counsel.

This the 23 day of September, 2021.

_____
Heidi Rayher

## STATEMENT OF ELIZABETH WILSON

FILED

⎯ 2021 SEP 29 A 10: 58

FORSYTH CO., C.S.C.

*Kristi Collough by*

I, Elizabeth Wilson, Plaintiff, state as follows:

1.  My address is 117 Old Mill Road, Sugar Grove, North Carolina 28679.

2.  I have retained Gloria R. Allred, Nathan Goldberg and Renee Mochkatel with the

    law firm of Allred, Maroko & Goldberg, 6300 Wilshire Boulevard, Suite 1500,

    Los Angeles, CA 90048, to represent me in the above-captioned matter and have

    agreed to the association of Lisa Andrews-Lanier, Donald S. Higley, II and

    Robert O. Jenkins, with the firm of Lanier Law Group, P.A., 4915 Piedmont

    Parkway, Suite 104, Jamestown, North Carolina, 27282, for purposes of allowing

    Gloria R. Allred, Nathan Goldberg and Renee Mochkatel to appear in this Court

    as Plaintiff's counsel.


This the 23 day of September, 2021.

Elizabeth Wilson

NORTH CAROLINA

FORSYTH COUNTY

FILED

2021 SEP 29 A 10: 57

FORSYTH CO., C.S.Q.

BY _Kulloughby_

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
21 CVS 4831

CHRISTOPHER ALLOWAYS-
RAMSEY, *et. al.*

Plaintiffs

v.

JANE ELIZABETH
MILLEY, individually and in her official
capacity, *et. al.*

Defendants

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**MOTION FOR ADMISSION**
***PRO HAC VICE***

NOW COMES **RENEE MOCHKATEL**, pursuant to N.C.G.S. § 84-4.1, and

respectfully files this Motion for Admission *Pro Hac Vice* to be allowed to be admitted to

practice in the North Carolina General Court of Justice for the limited purpose of representing

the Plaintiffs in this action. The undersigned respectfully represents to the Court the following:

1. My name is Renee Mochkatel.

2. I am regularly admitted to practice in the Courts of the State of California, and I
   am presently a member in good standing of the California State Bar and eligible to
   practice in the State of North Carolina.

3. My California State Bar number is 106049.

4. My mailing address is 6300 Wilshire Boulevard, Suite 1500, Los Angeles,
   California 90048. My phone number is (323) 653-6530, my fax number is (323) 653-
   1660 and my email address is rmochkatel@amglaw.com.

1

5. I am an attorney with the law firm of Allred, Maroko & Goldberg and have been requested by Plaintiffs to represent their interest subject to the approval of the Court in this matter.

6. The State of California, being a state in which I am regularly admitted to practice, grants privileges (*pro hac vice* admissions) to members of the Bar of North Carolina in good standing.

7. Unless permitted to withdraw sooner by Order of the Court, I will continue to represent Plaintiffs in the above captioned case until the final determination thereof, and with reference to all matters incident to such proceedings, I agree to be subject to the Orders and amenable to the disciplinary action and the civil jurisdiction of the North Carolina Superior Court and the North Carolina State Bar in all respects as if I were a regularly admitted and licensed member of the bar of North Carolina in good standing.

8. The law firm of Allred, Maroko & Goldberg has associated, and I am personally appearing (subject to approval of the Court) in the above captioned case with Lisa Andrews-Lanier, Donald S. Higley, II and Robert O. Jenkins, with the firm of Lanier Law Group, P.A., 6518 Airport Center Drive, Greensboro, North Carolina, 27409. The telephone number for that law firm is 800-814-1114 and Mr. Jenkins' facsimile number is 919-314-3361. Ms. Lanier, Mr. Higley and Mr. Jenkins are all residents of the State of North Carolina and are all duly and legally admitted to practice in the General Court of Justice in the State of North Carolina, and service may be had upon said attorneys in all matters connected with the legal proceeding or in any disciplinary matter regarding the above captioned case

2

the same effect as if personally made on me within the State of North Carolina.

WHEREFORE, Renee Mochkatel prays that the ~~Commission~~ Court grant her leave to appear *pro hac vice* for the limited purpose of representing the Plaintiffs in this action.

This the 22 day of September, 2021.

_____
Renee Mochkatel

Sworn to and subscribed before me,
this the 22 day of September, 2021.

Notary Public

_____
Printed Name

My Commission expires: 3. 14. 2023

ANNE SHINBROT
Notary Public - California
Los Angeles County
Commission # 2280891
My Comm. Expires Mar 14, 2023

NORTH CAROLINA           IN THE GENERAL COURT OF JUSTICE

SUPERIOR COURT DIVISION

FORSYTH COUNTY     F I L E D        21 CVS **4831**

CHRISTOPHER ALLOWAY-RAMSEY, *et. al.*    2021 SEP 29 A 10: 57 )

FORSYTH CO., O.S.C.

Plaintiffs    BY *Kim Willoughby*

)

v.                                **MOTION FOR ADMISSION**

                                      *PRO HAC VICE*

JANE ELIZABETH )
MILLEY, individually and in her official )
capacity, *et. al.* )

)

Defendants )

NOW COMES **NATHAN GOLDBERG**, pursuant to N.C.G.S. § 84-4.1, and

respectfully files this Motion for Admission *Pro Hac Vice* to be allowed to be admitted to

practice in the North Carolina General Court of Justice for the limited purpose of representing

the Plaintiffs in this action. The undersigned respectfully represents to the Court the following:

1. My name is Nathan Goldberg.

2. I am regularly admitted to practice in the Courts of the State of California, and I

   am presently a member in good standing of the California State Bar and eligible to

   practice in the State of North Carolina.

3. My California State Bar number is 61292.

4. My mailing address is 6300 Wilshire Boulevard, Suite 1500, Los Angeles,

   California 90048. My phone number is (323) 653-6530, my fax number is (323) 653-

   1660 and my email address is ngoldberg@amglaw.com.

1

5. I am an attorney with the law firm of Allred, Maroko & Goldberg and have been requested by Plaintiffs to represent their interest subject to the approval of the Court in this matter.

6. The State of California, being a state in which I am regularly admitted to practice, grants privileges (*pro hac vice* admissions) to members of the Bar of North Carolina in good standing.

7. Unless permitted to withdraw sooner by Order of the Court, I will continue to represent Plaintiffs in the above captioned case until the final determination thereof, and with reference to all matters incident to such proceedings, I agree to be subject to the Orders and amenable to the disciplinary action and the civil jurisdiction of the North Carolina Superior Court and the North Carolina State Bar in all respects as if I were a regularly admitted and licensed member of the bar of North Carolina in good standing.

8. The law firm of Allred, Maroko & Goldberg has associated, and I am personally appearing (subject to approval of the Court) in the above captioned case with Lisa Andrews-Lanier, Donald S. Higley, II and Robert O. Jenkins, with the firm of Lanier Law Group, P.A., 6518 Airport Center Drive, Greensboro, North Carolina, 27409. The telephone number for that law firm is 800-814-1114 and Mr. Jenkins' facsimile number is 919-314-3361. Ms. Lanier, Mr. Higley and Mr. Jenkins are all residents of the State of North Carolina and are all duly and legally admitted to practice in the General Court of Justice in the State of North Carolina, and service may be had upon said attorneys in all matters connected with the legal proceeding or in any disciplinary matter regarding the above captioned case

2

the same effect as if personally made on me within the State of North Carolina.

WHEREFORE, Nathan Goldberg prays that the ~~Commission~~ *Court* grant his leave to appear

*pro hac vice* for the limited purpose of representing the Plaintiffs in this action.

This the 25 day of September, 2021.

Nathan Goldberg

Sworn to and subscribed before me,
this the 25 day of September, 2021.

Notary Public

Printed Name          MARK C. GLODE
                      NOTARY PUBLIC

My Commission expires: Dec, 18, 2024

MARK C. GLODE
Notary Public - California
Los Angeles County
Commission # 2337965
My Comm. Expires Dec 18, 2024

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of LOS ANGELES

Subscribed and sworn to (or affirmed) before me on this 25 day of SEPTEMBER , 20 21 , by _____
NATHAN GOLDBERG ,
proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

MARK C. GLODE
Notary Public · California
Los Angeles County
Commission # 2337965
My Comm. Expires Dec 18, 2024

(Seal)                    Signature _____

NORTH CAROLINA

FILED

FORSYTH COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
21 CVS 4831

2021 SEP 29  A 10: 57

FORSYTH CO., C.S.C.,

BY Kim Willoughby

CHRISTOPHER ALLOWAYS-
RAMSEY, *et. al.*

Plaintiffs

v.

JANE ELIZABETH
MILLEY, individually and in her official
capacity, *et. al.*

Defendants

)
)
)
)
)
)
)
)
)
)
)
)
)
)

**MOTION FOR ADMISSION**
*PRO HAC VICE*

NOW COMES **GLORIA R. ALLRED**, pursuant to N.C.G.S. § 84-4.1, and

respectfully files this Motion for Admission *Pro Hac Vice* to be allowed to be admitted to

practice in the North Carolina General Court of Justice for the limited purpose of representing

the Plaintiffs in this action. The undersigned respectfully represents to the Court the following:

1. My name is Gloria R. Allred.

2. I am regularly admitted to practice in the Courts of the State of California, and I

   am presently a member in good standing of the California State Bar and eligible to

   practice in the State of North Carolina.

3. My California State Bar number is 65033.

4. My mailing address is 6300 Wilshire Boulevard, Suite 1500, Los Angeles,

   California 90048. My phone number is (323) 653-6530, my fax number is (323) 653-

   1660 and my email address is gallred@amglaw.com.

1

5. I am an attorney with the law firm of Allred, Maroko & Goldberg and have been requested by Plaintiffs to represent their interest subject to the approval of the Court in this matter.

6. The State of California, being a state in which I am regularly admitted to practice, grants privileges (*pro hac vice* admissions) to members of the Bar of North Carolina in good standing.

7. Unless permitted to withdraw sooner by Order of the Court, I will continue to represent Plaintiffs in the above captioned case until the final determination thereof, and with reference to all matters incident to such proceedings, I agree to be subject to the Orders and amenable to the disciplinary action and the civil jurisdiction of the North Carolina Superior Court and the North Carolina State Bar in all respects as if I were a regularly admitted and licensed member of the bar of North Carolina in good standing.

8. The law firm of Allred, Maroko & Goldberg has associated, and I am personally appearing (subject to approval of the Court) in the above captioned case with Lisa Andrews-Lanier, Donald S. Higley, II and Robert O. Jenkins, with the firm of Lanier Law Group, P.A., 6518 Airport Center Drive, Greensboro, North Carolina, 27409. The telephone number for that law firm is 800-814-1114 and Mr. Jenkins' facsimile number is 919-314-3361. Ms. Lanier, Mr. Higley and Mr. Jenkins are all residents of the State of North Carolina and are all duly and legally admitted to practice in the General Court of Justice in the State of North Carolina, and service may be had upon said attorneys in all matters connected with the legal proceeding or in any disciplinary matter regarding the above captioned case

2

the same effect as if personally made on me within the State of North Carolina.

WHEREFORE, Gloria R. Allred prays that the ~~Commission~~ *Court* grant her leave to appear *pro hac vice* for the limited purpose of representing the Plaintiffs in this action.

This the 23 day of September, 2021.

_Gloria R. Allred_
Gloria R. Allred

Sworn to and subscribed before me,
this the 33rd day of September, 2021.

Notary Public _____

_Kamal P Soni_
Printed Name _____

My Commission expires: 3|31|2023

KAMAL P. SONI
Notary Public, State of New York
No. 01SO6089949
Qualified in Kings County
Commission Expires March 31, 2023

NORTH CAROLINA

FORSYTH COUNTY

FILED

2021 SEP 29  A 10: 51

FORSYTH CO., C.S.C.

*Kim Willoughby*

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
21 CVS 4831

CHRISTOPHER ALLOWAYS-
RAMSEY, MARY SLOAN GILLIAM,
ELIZABETH JOHNSON, HEIDI
RAYHER, TERENCE STEINER,
ELIZABETH WILSON and
CHRISTOPHER SODERLUND,
individually and for all others similarly
situated

           Plaintiffs

v.

JANE ELIZABETH
MILLEY, individually and in her official
capacity, LARRY ALAN SMITH,
individually and in his official capacity,
PEGGY DODSON, individually and in her
official capacity, WILLIAM TRIBBY,
individually and in his official capacity,
DIANNE MARKHAM, individually and
in her official capacity, ALAN RUST,
individually and in his official capacity,
and RICHARD GAIN, individually and in
his official capacity and the UNIVERSITY
OF NORTH CAROLINA SCHOOL OF
THE ARTS (*FKA* North Carolina School
of the Arts)

           Defendants

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**COMPLAINT**

      NOW COME Plaintiffs on behalf of themselves individually and for all others similarly

situated and who were victims of sexual abuse and exploitation while students at the University

1

of North Carolina School of the Arts, complaining of Defendants and upon knowledge and/or upon information and belief allege and say as follows:

## INTRODUCTION

1.      Plaintiffs bring this action on behalf of themselves individually and on behalf of the class of all other current or former students at the University of North Carolina School of the Arts who were victims of sexual abuse and/or exploitation as minor students who were entrusted to the purported oversight, care and supervision of the faculty, staff and administration at the University of North Carolina School of the Arts.  For many years, the Defendant administrators at the University of North Carolina School of the Arts knew or should have known of the dangerous culture that permeated the institution and that permitted and condoned the sexual abuse and exploitation of students attending the school.  Despite this knowledge, the Defendant administrators at the University of North Carolina School of the Arts turned a willful blind eye to the egregious conduct suffered by so many of the school's students, specifically including Plaintiffs and others similarly situated.  Despite what the Defendant former administrators clearly knew or should have known about this horrific abuse and exploitation of minor students, the Defendant former administrators failed to take any reasonable steps to protect Plaintiffs and other minor students similarly situated from the danger of being sexually abused and exploited by members of the faculty, staff and/or administration at the school.

## PARTIES AND JURISDICTION

2.      Plaintiff Heidi Rayher (hereinafter "Heidi" and/or "Plaintiff Heidi" and/or collectively with the other named Plaintiffs in this action as "Plaintiffs") is a citizen and resident of Almeda County, California.

3.      At all times relevant to the sexual abuse and exploitation alleged herein, Plaintiff

2

Heidi was a minor student at the University of North Carolina School of the Arts and relied upon and was dependent upon the faculty, staff and administrators of the school to provide for her care, safety and supervision. The negligent conduct alleged herein occurred at or near the campus of the University of North Carolina School of the Arts in Winston-Salem, North Carolina.

4.     Plaintiff Mary Sloan Gilliam (hereinafter "Mary" and/or "Plaintiff Mary" and/or collectively with the other named Plaintiffs in this action as "Plaintiffs") is a citizen and resident of Charleston County, South Carolina.

5.     At all times relevant to the sexual abuse and exploitation alleged herein, Plaintiff Mary was a minor student at the University of North Carolina School of the Arts and relied upon and was dependent upon the faculty, staff and administrators of the school to provide for her care, safety and supervision. The negligent conduct alleged herein occurred at or near the campus of the University of North Carolina School of the Arts in Winston-Salem, North Carolina.

6.     Plaintiff Terence Steiner (hereinafter "Terence" and/or "Plaintiff Terence" and/or collectively with the other named Plaintiffs in this action as "Plaintiffs") is a citizen and resident of Huntington, West Virginia.

7.     At all times relevant to the sexual abuse and exploitation alleged herein, Plaintiff Terence was a minor student at the University of North Carolina School of the Arts and relied upon and was dependent upon the faculty, staff and administrators of the school to provide for his care, safety and supervision. The negligent conduct alleged herein occurred at or near the campus of the University of North Carolina School of the Arts in Winston-Salem, North Carolina.

3

8.      Plaintiff Elizabeth Johnson (hereinafter "Elizabeth J." and/or "Plaintiff Elizabeth J." and/or collectively with the other named Plaintiffs in this action as "Plaintiffs") is a citizen and resident of Gainesville, Florida.

9.      At all times relevant to the sexual abuse and exploitation alleged herein, Plaintiff Elizabeth J. was a minor student at the University of North Carolina School of the Arts and relied upon and was dependent upon the faculty, staff and administrators of the school to provide for her care, safety and supervision.  The negligent conduct alleged herein occurred at or near the campus of the University of North Carolina School of the Arts in Winston-Salem, North Carolina.

10.      Plaintiff Elizabeth Wilson (hereinafter "Elizabeth W." and/or "Plaintiff Elizabeth W." and/or collectively with the other named Plaintiffs in this action as "Plaintiffs") is a citizen and resident of Mount Pleasant, South Carolina.

11.      At all times relevant to the sexual abuse and exploitation alleged herein, Plaintiff Elizabeth W. was a minor student at the University of North Carolina School of the Arts and relied upon and was dependent upon the faculty, staff and administrators of the school to provide for her care, safety and supervision.  The negligent conduct alleged herein occurred at or near the campus of the University of North Carolina School of the Arts in Winston-Salem, North Carolina.

12.      Plaintiff Christopher Alloways-Ramsey (hereinafter "Chris" and/or "Plaintiff Chris" and/or collectively with the other named Plaintiffs in this action as "Plaintiffs") is a citizen and resident of Salt Lake City, Utah.

13.      At all times relevant to the sexual abuse and exploitation alleged herein, Plaintiff Chris was a minor student at the University of North Carolina School of the Arts and relied upon

4

and was dependent upon the faculty, staff and administrators of the school to provide for his care, safety and supervision. The negligent conduct alleged herein occurred at or near the campus of the University of North Carolina School of the Arts in Winston-Salem, North Carolina.

14. Plaintiff Christopher Soderlund (hereinafter "Christopher" and/or "Plaintiff Christopher" and/or collectively with the other named Plaintiffs in this action as "Plaintiffs") is a citizen and resident of Boise, Idaho.

15. At all times relevant to the sexual abuse and exploitation alleged herein, Plaintiff Chris was a minor student at the University of North Carolina School of the Arts and relied upon and was dependent upon the faculty, staff and administrators of the school to provide for his care, safety and supervision. The negligent conduct alleged herein occurred at or near the campus of the University of North Carolina School of the Arts in Winston-Salem, North Carolina.

16. Defendant the University of North Carolina School of the Arts (formerly known as the North Carolina School of the Arts) (hereinafter referred to as "UNCSA" and/or "the school) is a state institution and is a constituent institution of the University of North Carolina system, with its principal place of business located in Winston-Salem, Forsyth County, North Carolina.

17. At all times relevant to the sexual abuse and exploitation alleged herein, Defendants Milley, Smith, Dodson, Tribby, Markham, and Rust were administrators and/or instructors at UNCSA and the actions and/or failures to act of each as alleged herein occurred while each was acting within the course and scope of his/her employment and/or agency with UNCSA.

5

18.     At all times relevant to the sexual abuse and exploitation alleged herein, each of the individually named Defendants – as an administrator and/or an instructor at UNCSA -- had a duty and obligation to provide for the care, safety and supervision of the minor students attending UNCSA and entrusted to their care.

19.     Upon information and belief, Defendant Jane Elizabeth Milley (hereinafter referred to as "Defendant Milley" and/or collectively with the other named Defendants in this action as "Defendants") is a citizen and resident of South Weymouth, Massachusetts.

20.     At all times relevant to the sexual abuse and exploitation alleged herein, Defendant Milley was Chancellor of the UNCSA.  Defendant Milley served as UNCSA Chancellor from 1984 until she resigned on June 30, 1989.

21.     At all times relevant to the sexual abuse and exploitation alleged herein, Defendant Milley – as an administrator at UNCSA -- had a duty and obligation to provide for the care, safety and supervision of the minor students attending UNCSA and entrusted to her care.

22.     Upon information and belief, Defendant Larry Alan Smith (hereinafter referred to as "Defendant Smith" and/or collectively with the other named Defendants in this action as "Defendants") is a citizen and resident of Avon, Connecticut.

23.     At all times relevant to the sexual abuse and exploitation alleged herein, Defendant Smith was Dean of the UNCSA School of Music.

24.     At all times relevant to the sexual abuse and exploitation alleged herein, Defendant Smith – as an administrator at UNCSA -- had a duty and obligation to provide for the care, safety and supervision of the minor students attending UNCSA and entrusted to his care.

25.     Upon information and belief, Defendant Peggy Dodson (hereinafter referred to as "Defendant Dodson" and/or collectively with the other named Defendants in this action as

6

"Defendants") is a citizen and resident of Clemmons, North Carolina.

26.     At all times relevant to the sexual abuse and exploitation alleged herein, Defendant Dodson was Associate Vice Chancellor of High School Programs at the UNCSA. Defendant Dodson served as UNCSA's Associate Vice Chancellor of High School Programs from 1981 - 2006.

27.     At all times relevant to the sexual abuse and exploitation alleged herein, Defendant Dodson – as an administrator at UNCSA -- had a duty and obligation to provide for the care, safety and supervision of the minor students attending UNCSA and entrusted to her care.

28.     Upon information and belief, Defendant William "Bill" Tribby (hereinafter referred to as "Defendant Tribby" and/or collectively with the other named Defendants in this action as "Defendants") is a citizen and resident of Winston-Salem, North Carolina.

29.     At all times relevant to the sexual abuse and exploitation alleged herein, Defendant Tribby was Dean of General Studies at the UNCSA.  Defendant Dodson served as UNCSA's Dean of General Studies from 1978 - 1999.

30.     At all times relevant to the sexual abuse and exploitation alleged herein, Defendant Tribby – as an administrator at UNCSA -- had a duty and obligation to provide for the care, safety and supervision of the minor students attending UNCSA and entrusted to his care.

31.     Upon information and belief, Defendant Diane Markham (hereinafter referred to as "Defendant Markham" and/or collectively with the other named Defendants in this action as "Defendants") is a citizen and resident of East Bend, North Carolina.

32.     At all times relevant to the sexual abuse and exploitation alleged herein, Defendant Markham was Assistant Dean of Modern Dance at the UNCSA.

7

33.     At all times relevant to the sexual abuse and exploitation alleged herein, Defendant Markham – as an administrator at UNCSA -- had a duty and obligation to provide for the care, safety and supervision of the minor students attending UNCSA and entrusted to her care.

34.     Upon information and belief, Defendant Alan Rust (hereinafter referred to as "Defendant Rust" and/or collectively with the other named Defendants in this action as "Defendants") is a citizen and resident of South Chatham, Massachusetts.

35.     At all times relevant to the sexual abuse and exploitation alleged herein, Defendant Rust was Dean of the School of Drama at the UNCSA.

36.     At all times relevant to the sexual abuse and exploitation alleged herein, Defendant Rust – as an administrator at UNCSA -- had a duty and obligation to provide for the care, safety and supervision of the minor students attending UNCSA and entrusted to his care.

37.     Upon information and belief, Defendant Richard Gain (hereinafter referred to as "Gain" and/or "Defendant Gain" and/or collectively with the other named Defendants in this action as "Defendants") is a citizen and resident of East Bend, North Carolina.

38.     This Court has personal jurisdiction over all named Defendants in that at all times relevant hereto Defendants conducted their work, business and activities in the state of North Carolina.

39.     This Court has subject matter jurisdiction over Plaintiffs' claims in that the claims arose under the substantive law of North Carolina.

40.     Defendant Milley has been properly served with the Summons and Complaint in this action and there are no issues of process or service of process.

8

41. Defendant Smith has been properly served with the Summons and Complaint in this action and there are no issues of process or service of process.

42. Defendant Dodson has been properly served with the Summons and Complaint in this action and there are no issues of process or service of process.

43. Defendant Tribby has been properly served with the Summons and Complaint in this action and there are no issues of process or service of process.

44. Defendant Markham has been properly served with the Summons and Complaint in this action and there are no issues of process or service of process.

45. Defendant Rust has been properly served with the Summons and Complaint in this action and there are no issues of process or service of process.

46. Defendant Gain has been properly served with the Summons and Complaint in this action and there are no issues of process or service of process.

47. Pursuant to N.C. Gen. Stat. § 143-300.3, each individual Defendant, as a former employee of the state of North Carolina, is upon request entitled to have the state of North Carolina provide his/her defense to this civil proceeding brought against him/her in his/her individual capacity based on his/her acts or failures to act done in the course and scope of his/her state employment.

## FACTUAL BACKGROUND

48. UNCSA was founded in 1963 and opened its doors to students in 1965 as the nation's first public arts conservatory.

49. From its inception, UNCSA offered middle school, high school and college age students specialized training in the performing and visual arts. When it first began operating,

9

Defendant UNCSA's middle and high school was the country's only state-supported boarding school for the arts.

50.     From its beginning, UNCSA actively recruited boys and girls as young as twelve (12) years old to come live at UNCSA to study ballet, modern dance and other disciplines.

51.     In addition to their duty and obligation to provide UNCSA's young students with education and training in their chosen artistic disciplines, Defendants Milley, Smith, Dodson, Tribby, Markham and Rust – as UNCSA administrators -- had a duty and obligation to provide these young boys and girls with a safe and secure environment in which they could learn and grow.

52.     Despite the clear obligation to the boys and girls who chose to attend the school, Defendants Milley, Smith, Dodson, Tribby, Markham and Rust instead allowed there to develop a culture of sexual abuse and exploitation of the young students in their care. Upon information and belief, this dangerous culture of accepted sexual abuse and exploitation continued for two decades or more and negatively impacted potentially hundreds of students, including Plaintiffs.

53.     Despite the clear obligation to the boys and girls who chose to attend the school, Defendant UNCSA's deliberate indifference allowed there to develop a culture of sexual abuse and exploitation of the young students in their care. Upon information and belief, this dangerous culture of accepted sexual abuse and exploitation continued for two decades or more and negatively impacted potentially hundreds of students, including the named Plaintiffs and the unnamed members of the class.

54.     As one prominent former UNCSA student has been quoted as saying: the school was "a cesspool of sexual abuse that took place behind walls and closed doors, with little chance

of help for young people as there was nowhere to go for help . . . it was like shooting fish in a barrel for predators."

55.     Upon information and belief, throughout the 1970s and 1980s (and likely beyond), Defendants Milley, Smith, Dodson, Tribby, Markham and Rust -- despite the fact that they clearly knew or should have known of the sexual exploitation and abuse of minor students that was occurring at UNCSA -- unconscionably allowed this egregious and outrageous conduct to continue without taking any steps to report, intervene, investigate, discipline, pursue criminal charges, stop the abuse and exploitation or take any other steps to protect Plaintiffs and other students at UNCSA.  Examples of the sexual exploitation and abuse that Defendants Milley, Smith, Dodson, Tribby, Markham and Rust ignored and/or condoned, are both troubling and horrifying.

56.     In the 1970s and 1980s, the dance department at Defendant UNCSA was home of two of the most openly notorious faculty members – Richard Kuch (deceased) and Defendant Gain.

57.     Kuch and Gain made no secret of their efforts to have sexual relationships with UNCSA's minor students and were widely known to groom boys as young as 12 and 13 years old with the full and open intent of engaging in sexual activity with these adolescent students.

58.     Kuch and Gain, under the guise of dance instruction, constantly and repeatedly groped, fondled or otherwise touched in a sexual manner many of the male and female students in their care.  Further, they constantly subjected these young students to grossly inappropriate sexual comments, often encouraging and/or demanding that the middle school age students under their supervision should start having sex by saying such things as "go get a good fuck so you can learn to dance from your vagina."

11

59.     Kuch and Gain's abuse and exploitation of minor students was so widely known that among UNCSA students, faculty and administrators they were called "Crotch" and "Groin."

60.     Defendants Milley, Smith, Dodson, Tribby, Markham and Rust knew or should have known about this abhorrent conduct being directed toward the minor students under their care and supervision, yet did nothing to report, intervene, investigate, discipline, pursue criminal charges, stop the abuse and exploitation or otherwise protect Plaintiffs and other students at UNCSA from these open and notorious predators.

61.     Defendant UNCSA Milley, Smith, Dodson, Tribby, Markham and Rust knew or should have known about this abhorrent conduct being directed toward the minor students under their care and supervision, yet did nothing to report, intervene, investigate, discipline, pursue criminal charges, stop the abuse and exploitation or otherwise protect Plaintiffs and other students at UNCSA from these open and notorious predators.

62.     Kuch and Gain lived together on a rural property in the community of East Bend, outside of Winston-Salem.  Kuch and Gain would refer to their property as "The Farm," but among UNCSA students, some faculty and administrators, the Kuch and Gain property was known to be the location where Kuch and Gain would lure minor students for sexual exploitation.  As such, UNCSA students, some faculty and administrators referred to the Kuch and Gain property as "The Fuck Farm."

63.     Defendants Milley, Smith, Dodson, Tribby, Markham and Rust knew or should have known about this abhorrent conduct being directed toward the minor students under their care and supervision, yet did nothing to report, intervene, investigate, discipline, pursue criminal charges, stop the abuse and exploitation or otherwise protect Plaintiffs and other students at UNCSA from these open and notorious predators.

12

64.     Defendants Milley, Smith, Dodson, Tribby, Markham and Rust knew or should have known about this abhorrent conduct being directed toward the minor students under their care and supervision, yet did nothing to report, intervene, investigate, discipline, pursue criminal charges, stop the abuse and exploitation or otherwise protect Plaintiffs and other students at UNCSA from these open and notorious predators.

65.     The sexual abuse and exploitation inflicted upon minor students at the school by Kuch and Gain was not only known by students, faculty, staff and administrators at the school, but sadly was known among many of the members of the dance community nationwide.

66.     One former faculty member went to then-Vice Chancellor William "Bill" Pruitt and told Pruitt that UNCSA was having trouble recruiting young male dancers to their program because of the reputations and conduct of modern dance instructors Kuch and Gain.  Vice Chancellor Pruitt was specifically told that dance instructors around the country, in an attempt to protect their young students, refused to recommend UNCSA to their gifted young male dancers because it was widely known that Kuch and Gain would try to groom those young boys for sexual abuse and exploitation.  This former faculty member told Pruitt that he could no longer teach male ballet technique or other dance curriculum for boys/men because he could not recruit young male students.  Some members of the dance community around the country referred to Kuch and Gain as those two "sickos."  Pruitt did nothing to address this widely known sexual abuse and exploitation.

67.     The culture of condoning sexual abuse was not limited to the dance department. For example, upon information and belief, at one point in time the then-Dean of the Drama Department had a practice called, "Freshman Friday," where all the male freshman students had to go into his office where he fondled them, causing an erection, to see how hard they would get.

13

This Dean contended that it was understood that you could not be a successful drama student if you could not get sufficiently hard.

68.     The film school was also involved.  At one point in time, in the film school there was a group of graduate students who called themselves the "vagina hunters." They sought out 13-year-old female students in order to take their virginity.  Upon information and belief the then Dean of Students was made aware of this information and ignored and/or condoned it.

69.     Sexual relationships between faculty members and high school age students were widely known by UNCSA administrators -- including Defendants Milley, Smith, Dodson, Tribby, Markham and Rust -- who ignored and/or condoned such sexual exploitation.  If a male faculty member had sex with a minor student that resulted in the young girl getting pregnant the only help the school might offer would be to provide the young girl with information about getting an abortion.

70.     At all relevant times Defendants Milley, Smith, Dodson, Tribby, Markham and Rust knew or should have known of the repeated and ongoing sexual abuse and exploitation of UNCSA's students and despite this knowledge failed to report, intervene, investigate, discipline, pursue criminal charges, stop the abuse and exploitation or otherwise take any action to protect Plaintiffs and other students at UNCSA from these sexual predators who populated the faculty and/or administration.

71.     At all relevant times Defendant UNCSA knew or should have known of the repeated and ongoing sexual abuse and exploitation of UNCSA's students and despite this knowledge acted with deliberate indifference and failed to report, intervene, investigate, discipline, pursue criminal charges, stop the abuse and exploitation or otherwise take any action

14

to protect Plaintiffs and other students at UNCSA from these sexual predators who populated the faculty and/or administration.

72.     At all relevant times it was reasonably foreseeable to Defendants Milley, Smith, Dodson, Tribby, Markham and Rust that this repeated and ongoing sexual abuse and exploitation of students purportedly under their care and supervision would likely result in injury to the victims of this abuse and exploitation, including injury to Plaintiffs and others.

73.     At all relevant times it was reasonably foreseeable to Defendant UNCSA that this repeated and ongoing sexual abuse and exploitation of students purportedly under their care and supervision would likely result in injury to the victims of this abuse and exploitation, including injury to Plaintiffs and others and would deprive Plaintiffs of their right to a sound basic education as guaranteed by the North Carolina Constitution.

74.     Defendants Milley, Smith, Dodson, Tribby, Markham and Rust acted with conscious and/or reckless disregarded despite their knowledge of the repeated and ongoing sexual abuse and exploitation of UNCSA's students and the dangerous culture regarding such conduct that existed at the institution.

75.     Defendants Milley, Smith, Dodson, Tribby, Markham and Rust knew or should have known that their negligent, reckless, and outrageous actions and failures to act in ignoring, condoning and or perpetuating the culture of sexual abuse and exploitation of UNCSA's students would inflict severe emotional and psychological distress, as well as personal physical injury, on those students who were abused or exploited, including Plaintiffs, who did in fact suffer severe emotional and psychological distress and personal physical injury as a result of this wrongful conduct.

15

76.     Defendant UNCSA acted with conscious and/or reckless disregarded despite its knowledge of the repeated and ongoing sexual abuse and exploitation of UNCSA's students and the dangerous culture regarding such conduct that existed at the institution.

77.     Defendant UNCSA knew or should have known that its reckless, outrageous and deliberate indifference and its actions and/or failures to act in ignoring, condoning and or perpetuating the culture of sexual abuse and exploitation of UNCSA's students would inflict severe emotional and psychological distress, as well as personal physical injury, on those students who were abused or exploited, including Plaintiffs, who did in fact suffer severe emotional and psychological distress and personal physical injury as a result of this wrongful conduct and would deprive Plaintiffs of their right to a sound basic education as guaranteed by the North Carolina Constitution.

## FACTS SPECIFIC TO PLAINTIFF HEIDI RAYHER

78.     Heidi's introduction to UNCSA was in 1983, at age 14, and 1984 when she attended the summer program. During both summer programs Heidi took modern dance classes from Richard Gain and Richard Kuch. Heidi heard that Gain and Kuch were sexually inappropriate with underage students.  Her earliest memory of Gain and Kuch is being in their class and them telling their young students that they would never be successful dancers unless they got "fucked."  Heidi had never been exposed to adults, much less teachers, talking about sex. She was young, inexperienced, and was conditioned to believe this behavior was normal.

79.     After the 1984 summer program Heidi auditioned to become a fulltime student at UNCSA. It was a dream come true when she was accepted, and Heidi began her junior year with great hope. In addition to ballet classes, Heidi was required to take modern dance classes with

16

Gain and Kuch. By now she knew them by their nicknames, "Groin" and "Crotch" or the "Two Dicks."

80.     After her junior year, Heidi learned that she would not be invited back to the ballet program. She was bitterly disappointed, but her disappointment was tempered when she was informed that she might qualify for the modern dance program. Desperate to return to UNCSA for her senior year, Heidi auditioned and was accepted into the modern dance to complete her senior year.

81.     During senior year Heidi had to interact with Richard Gain and Richard Kuch more frequently. In addition to subjecting Heidi to sexually inappropriate language, her instructors often touched her inappropriately during class. For example, during classes in the large studio, Kuch would ball up his fist and apply it to her genitals when she was already in midair doing a leap. While she was in a grand plie position he would also clasp his hands together, and with some force, push his hands into Heidi's crotch on top of her genitals lifting her off the ground. Gain would also put his hands on her body, very near her breasts. She learned to accept this as "normal" behavior at UNCSA.

82.     In addition to the sexual language and sexual touching, Gain and Kuch often invited underage students to their off-campus home, known as The Farm. Heidi was invited to The Farm a number of times. Gain and Kuch made the students who were chosen to be guests at The Farm feel "special" and would then ply them with alcohol.

83.     Heidi was invited back to UNCSA as a college freshman to complete the modern dance program. However, because of the inappropriate sexual conduct that she had been exposed to, particularly during her senior year, Heidi became depressed and increasingly disengaged from the program. She was not invited back for her sophomore year of college.

17

84. After leaving UNCSA, Heidi gave up dance and her dream of becoming a professional dancer. She felt lost and alone, moved away, and waited tables. She also started smoking marijuana to help dull the pain of her experiences at UNCSA. Heidi never went back to school and her only connection with dance was joining a small company for a year or so while trying to find a direction for her life.

85. In the early 1990s Heidi moved to California. She married and started a family, but there was and continues to be a constant ache in her soul as a result of the abuse she suffered at UNCSA. She struggled with severe body image issues and eating disorders and sought validation by seeking sexual attention outside of her marriage. By the early 2000s she stopped using marijuana and began to self-medicate with alcohol. She continues to drink excessively because it is the only time she is able to turn off her brain and forget the past.

**FACTS SPECIFIC TO PLAINTIFF CHRISTOPHER ALLOWAYS- RAMSEY**

86. Chris first attended UNCSA in the summer of 1984. He was sixteen (16) years old.

87. Chris lived in the dorms at UNCSA while attending the summer program. He became friends with another underage male student who disclosed to him that he was having a sexual affair with two of the modern dance instructors who were nicknamed the "Two Dicks." Chris came to learn his friend was referring to Kuch and Defendant Gain.

88. Chris became a fulltime student in the ballet program in the fall of 1984 as an incoming junior.

89. Duncan Noble was one of Chris' primary ballet teachers during his first semester at school. Noble went out of his way to interact with Chris, making Chris feel special. Noble's attention made Chris believe that he was more talented than the other students. This is one of the

18

main reasons that Chris wanted to make Mr. Noble proud of him. Chris was committed to doing whatever was necessary to be worthy of Mr. Noble's attention.

90.     During a technique class that Noble taught, Noble began touching Chris' body in a sexual way. Noble would stick his pointer finger between Chris' butt checks and force it as high up his anus as the tights would allow. Noble instructed Chris to "squeeze" his finger under the guise of ballet training to help with posture. During class Noble would rub and/or pinch Chris' nipples claiming this was necessary to stimulate Chris so he would lift up his sternum for better posture

91.     Chris believed that all of the attention he received from Noble was to help him become a better dancer. Chris also knew that he needed Noble's continuing support to secure an invitation to continue at UNCSA in his senior year.

92.     Chris was one of several young men that Noble would stay and talk to after class, sharing stories of his magical career. At some point Chris was the only student who stayed after class. At that time, the focus of the conversations became increasingly sexual. For example, Noble asked Chris if had ever had sex with a man and told Chris about his sexual exploits with men while he was on tour.

93.     At some point in time, Noble invited Chris to his home to see his Ballet Russes and Ballet Theatre memorabilia. Chris was thrilled. He considered himself a keen ballet historian and was grateful for the opportunity to look at these documents. Upon arriving at Noble's home, which was off-campus and quite isolated, Noble welcomed Chris with open arms. For the first hour or so Mr. Noble shared his extensive collection of memorabilia with Chris, but at some point everything changed. Mr. Noble became physically affectionate with Chris and told Chris he wanted to see "his cock." Chris reluctantly undid his pants and took out his penis. Mr. Noble

19

immediately became obsessed with Chris' foreskin and began touching him. Chris froze in fear and felt he needed to submit to Mr. Noble, who was by then in complete control over this 17-year-old boy. Noble was Chris' mentor and teacher, and Chris understood that Noble could make or break his ability to pursue dance professionally. Noble knelt down and performed oral sex on Chris. He then led Chris to the couch and proceeded to penetrate Chris' anus with his finger, then with his penis.

94.     In the Spring of 1985, Noble took Chris and another student out for Mexican food in Winston-Salem. Noble purchased alcohol for them. Chris drank so much that when he got back to campus he fell and broke his ankle. This stopped him from traveling to Italy on a full scholarship to train and perform.

95.     Chris went to Noble's home a second time in the Spring of 1986 to pick up books. When he arrived Noble was drunk and he forced himself on Chris, leaving bite marks and bruises around Chris' nipples.

96.     In addition to the sexual abuse described above, Chris was also subjected to a harsh and exploitative sexual environment in his modern dance class taught by Kuch and Defendant Gain. During his junior and senior year, while in class, Kuch and Defendant Gain regularly engaged in grossly inappropriate sexual behavior telling the students, "You must get fucked – and often, if you want to become great artists." This mantra was repeated in nearly every class Chris took from Kuch and Defendant Gain.

### FACTS SPECIFIC TO PLAINTIFF MARY SLOAN GILLIAM

97.     Mary began attending UNCSA in the summer of 1983. After the 1984 summer intensive program, Mary was invited to become a full-time student. She entered UNCSA as 14 year old high school freshman in the fall of 1984.

20

98.     Mary knew that attending UNCSA was the first step toward achieving her goal of becoming a professional ballerina. She began her freshman year with two main priorities: to please and to succeed.

99.     As a ballet student, Mary had daily classes with ballet instructor, Melissa Hayden, during which Hayden touched Mary inappropriately. At least once a week, Hayden would slap or place her hand on Mary's buttocks. She would also force her hand onto Mary's upper and inner thigh, very close her genitalia. Mary became numb to these repeated acts of inappropriate touching, especially since she witnessed the same abuse inflicted on her classmates nearly every time she was in class. Mary was made to believe this behavior was normal.

100.    As a classical ballet student, Mary was also required to take modern dance classes with instructors Kuch and Defendant Gain. Mary had heard that both instructors were known to have had regular and frequent sexual affairs with underage students. Kuch's conduct toward Mary during a floor barre class was particularly egregious. The students would lie on the floor with one leg up in the air and the other leg bent with their foot on the floor. As Mary held this pose, Kuch stood extremely close to Mary while staring directly down into her crotch for extended periods of time. Kuch stood so close to her that if her leg faltered, it would touch his groin. Indeed, he was so close to her that she could literally feel his breath. This made her extremely uncomfortable, but she was powerless to do anything about it.

101.    Mary heard that Kuch and Defendant Gain, known on campus as "Crotch" and "Groin" along with ballet instructors Frank Smith and Fanchon Cordell, often hosted underage students in their homes and freely served alcohol to minors. It was "a badge of honor" for students to be invited to these gatherings given that Kuch and Defendant Gain offered them special treatment.

21

102. During her years at UNCSA, Mary became extremely introverted. She could not understand how the administration allowed the instructors to sexually abuse and humiliate the students. Indeed, inappropriate sexual conduct between students and faculty appeared to be an accepted part of the UNCSA artistic life, as though it would make you a better dancer. She became very guarded during her years at UNCSA. Much of her adult mores were established during her years at UNCSA. Mary developed low self-esteem and felt she was never good enough. These feelings negatively shaped Mary's adult life.

103. Mary graduated from UNCSA, and in 1988 started dancing for the Fort Worth Ballet. The Director sexually pursued her, and based on her twisted experiences at UNCSA, Mary believed that this was a "normal" part of a dancer's world. She knew that if she did not comply with his demands that she would have no career. Mary was so conflicted that she ended up leaving the company and stopped dancing which was extremely difficult for her. Throughout her early adulthood Mary believed that a healthy relationship was one in which she was submissive to an overly authoritative partner, launching her from one unhealthy relationship to another.

## FACTS SPECIFIC TO PLAINTIFF ELIZABETH JOHNSON

104. Elizabeth J. was a full-time student at UNCSA during her junior and senior years of high school. In 1984, when she was 15, she began living on the UNCSA campus. She was overjoyed when she had been accepted into the program, believing it was the right place for her to achieve her dreams of dancing professionally.

105. Although she was a student of classical ballet, ballet students were required to take modern dance classes. Elizabeth J. knew from classmates that she needed to be wary of Richard Gain and Richard Kuch, as they were known throughout the campus to be sexually

22

abusive with students. Like others, Elizabeth J. had heard that Gain and Kuch were referred to as "Crotch" and "Groin."

106. Defendant Gain immediately made Elizabeth J. uncomfortable when she began taking his modern dance classes. On numerous occasions while she was performing a Martha Graham exercise, Defendant Gain placed his hand under her breast, touching and cupping it. If she did not have the appropriate arch in her back, Defendant Gain would directly touch her breast. This was the first time that someone had touched Elizabeth J.'s breast in a sexual manner, and it was repulsive because it happened so many times. At other times during class, Defendant Gain touched Elizabeth J.'s other intimate parts including her pubic area, inner thigh, chest and buttocks. She felt powerless to stop him.

107. During class, Defendant Gain and Kuch repeatedly told their young students that until they got "fucked" they would never be real artists. Elizabeth J. began questioning whether she would be able to succeed at her craft. It was also commonplace for both Defendant Gain and Kuch to use inappropriate language when referring to the body, including "tits" and "ass" when referring to female anatomy. Elizabeth J. and her classmates were just 15 and 16 years old and didn't know how to react in class. The only thing she did know was that she did not want to anger her instructors.

108. Elizabeth J. was particularly distressed by the stories she heard from friends about Defendant Gain and Kuch sexually abusing her young male classmates at their home known as The Farm. She heard that there were regularly "gay orgies" at the Farm and that both Defendant Gain and Kuch had sex with underage boys.

109. Elizabeth J.'s last year at UNCSA was particularly difficult. She was supposed to take an apprenticeship at the Milwaukee Ballet but became injured during her summer there. She

23

appealed to UNCSA and asked them to let her return for college (choosing the familiar hell over the unknown). All the same abuses continued. She was terribly depressed and thought of quitting dance. She was told by her religious community that dance was sinful, and based on her personal experiences at UNCSA, she questioned her desire to dance.

110. After her first year of college at UNCSA, she quit dancing and began working as a receptionist. She never imagined her life would take this unexpected turn after dedicating herself to dance for so many years. It was not until 1988 that she re-enrolled in college and eventually graduated from George Mason in 1994. Elizabeth J. married at 21 and began therapy at 22 to deal with the trauma she suffered during high school. Before she was 30 years old Elizabeth J. had 3 young children. She ultimately left her marriage and divorced.

111. When Elizabeth J. was 32 years old, she was accepted into graduate school and received her MFA in 2003 from the University of Illinois. It was a long, hard road, but Elizabeth J. was tenacious and focused on her goal of becoming a dance educator who treated students with respect and dignity. By now she knew that the treatment she was subjected to at UNCSA was wrong. She currently teaches at the University of Florida in Defendant Gainsville. Elizabeth J. has been in therapy for many years. She has been diagnosed with Post Traumatic Stress Disorder, depression and anxiety. Elizabeth J. continues to suffer from low self-esteem and self-doubt, the direct result of the abuse she was subjected to a UNCSA.

## FACTS SPECIFIC TO PLAINTIFF TERENCE STEINER

112. Terence began attending the summer program at UNCSA in 1983 when he was just 12 years old. It was the thrill of his young life to have the opportunity to learn from icons of the dance world.

24

113.     Modern dance instructors, Richard Kuch and Richard Defendant Gain, were in their 50s when they first met Terence. It was widely known that Kuch and Defendant Gain were in a relationship and that they lived together on a property near campus known as "The Farm." Both Defendant Gain and Kuch showed immediate interest in 12-year-old Terence. Terence innocently believed that their fixation was because of his superior dance skills. He felt honored and resolved to work hard and make both Defendant Gain and Kuch proud.

114.     By the end of the 1983 summer program, Kuch made it clear to Terence that he would help ensure Terence's acceptance into the high school program. When Terence returned home at the end of the summer program, Kuch sent postcards and called Terence on the phone. Defendant Gain similarly contacted Terence even over the summer. Terence and his parents were grateful that Kuch was willing to support Terence's dream to attend UNCSA and could not believe their good fortune. Consistent with Kuch's promises, Terence was admitted into UNCSA high school program without having to audition.

115.     When Terence moved onto campus at 12 years old, he was one of the youngest students ever admitted as a freshman to the dance program. He recalls that one of the first modern dance classes he took, the students were required to wear very revealing bathing suits. Terence thought this was strange but felt he had to comply, as did the other students.

116.     It was during this vulnerable time that Richard Defendant Gain's interest in Terence became overtly sexual. Defendant Gain casted Terence to perform a dance with him, then after rehearsal insisted that Terence go out with him to the movies or to his home. Terence remembers being in the car, a dark movie theater, or at the "Farm" with Defendant Gain when he became sexually aggressive. He touched Terence's hips, thighs, and crotch area. Terence tried in

25

vain to deflect the terror he was feeling by trying to ignore these sexual advances. Defendant Gain told him that his body was beautiful while he explored every inch of it with his hands.

117.    Terence recalls that Defendant Gain insisted on driving him to an event called Beux Arts. Defendant Gain had been drinking. At one point he pulled the car over to the side of road on Waughtown Street and forced his tongue down Terence's throat. Terence was sickened by this attack but did not know what to do.

118.    After this attack, Terence returned home for the summer. Terence returned to campus several weeks later in advance of going on a school sponsored trip to London for additional training. Defendant Gain was also going on the trip, and somehow Terence was to stay on The Farm with Defendant Gain while Kuch was away. During Terence's stay, Defendant Gain frequently walked around naked, his penis semi-erect, in front of Terence and went skinny dipping. When it was time to feed The Farm's animals, Defendant Gain took Terence with him. As they were feeding the sheep Defendant Gain looked at Terence and told him that "the sheep give the best blow jobs."

119.    On the school trip to London, Defendant Gain continued his sexual pursuit of Terence.

120.    During rehearsals for Gitaneria, Defendant Gain sent everyone home except for Terence and two other boys in the show. He forced them to do hip slides over and over until Terence's hips were literally bleeding. Defendant Gain grabbed Terence by the hair and told him to "dance like a man, not a little boy!" It was terrifying. In addition, Defendant Gain inappropriately touched Terence and his classmates during the technique class. Defendant Gain pushed his clasped hands between Terence's legs until his hands touched his crotch, claiming this would help him jump higher or stand taller. He also slapped Terence's buttocks countless

26

times. Terence was made to believe that this conduct was normal because he saw it happening to his classmates.

121.    Terence graduated from UNCSA at 17 and attempted to begin his career as a professional dancer. But the pain of what he had endured at UNCSA was too much. In 1988, Terence began using drugs to help him forget the sexual abuse he endured at UNCSA and soon became addicted to cocaine and ecstasy. In 1989, Terence was hospitalized at Beth Israel Medical Center after an adverse drug reaction. He was diagnosed with generalized anxiety disorder, clinical depression, panic attacks and PTSD with agoraphobia. When Terence was released from the hospital, he was unable to leave his apartment other than when he needed food or had a doctor's appointment, rendering him unable to dance.

122.    In order to survive, Terence decided to leave the United States in and make a fresh start in Europe. Although his dance career flourished for a short time, he again became severely depressed and returned to the United States in 1991 to restart his dance career. However, Terence could not function without psychiatric medication. He also relapsed and began abusing alcohol and drugs. Terence has suffered from severe insomnia, night terrors, panic attacks and heightened anxiety, which forced him to stop driving in 2004.

123.    In 2006, Terence began experiencing suicidal ideations and was hospitalized in a psychiatric facility. In 2010, Terence attempted suicide by overdosing on Tegretol. After his stomach was pumped to save his life, Terence spent one month inpatient at Queens County Hospital receiving psychiatric treatment. Sadly, he attempted suicide a second time in 2013, when he jumped from a third-floor window fracturing his lumbar and breaking his left calcaneus. He then spent one month in St. Mary's Hospital in Huntington, West Virginia dealing with his

depression. Tragically, the trauma of UNCSA has resulted in Terence being hospitalized a dozen times for mental health issues.

124. The sexual abuse that Terence was subjected to at UNCSA ruined his life at every level. The severe depression that he has lived with since the late 1980s has negatively impacted his ability to work or have a healthy intimate relationship because he viewed himself as "damaged goods."

125. Terence continues to this day to struggle with the mental health issues brought on by the sexual abuse he was subjected to as a minor while in the care of UNCSA. He is presently under the care of a psychiatrist and continues to suffer from overwhelming anxiety and chronic panic attacks. He has continuing night terrors and he vomits most mornings because of his PTSD. He currently takes Busbar for anxiety, Paxil for depression, Remeron for insomnia and Clonidine for PTSD.

## FACTS SPECIFIC TO PLAINTIFF ELIZABETH WILSON

126. Elizabeth W. 14 years old in 1985 when she attended the summer program at UNCSA. Elizabeth W., who loved dance, hoped to attend UNCSA for high school. She believed that attending UNCSA was her only pathway to achieving her dream of becoming a professional ballet dancer. The summer program was Elizabeth W.'s opportunity to get to know and impress the faculty who would decide if she would be invited into this elite school. Like others, Elizabeth W. was elated when Richard Kuch took a special interest in her during the summer program. By the end of the summer, Kuch had convinced Elizabeth W. that she should apply to the modern dance program instead of ballet.

127. Elizabeth W. was invited to attend UNCSA's modern dance program and began as a sophomore, in the fall of 1985. She was excited to be able to learn from Richard Defendant

28

Gain and Richard Kuch, both of whom were well-respected professional dancers. Elizabeth W. was one of 5 high school students accepted into the modern dance program that year, the rest being college freshmen.

128.    In her first year at UNCSA, Kuch started making sexual advances on Elizabeth W. when she took his technique class. While Elizabeth W. was performing a certain exercise that required her to stand with her feet spread wide apart, Kuch pressed his pelvis against her backside, then slowly slid down the side of her body until he was squatting at the break of her hips. He was so close she could feel his breath. This was especially confusing because she had been groomed to feel "special" for capturing his attention. Kuch would also hover over 14-year-old Elizabeth W. during class and touch her body provocatively. While Elizabeth W. was doing floor exercises Kuch would squat and put his crotch in her face. He also would forcefully push his clasped hands between her legs into her crotch to "help" her jump higher. Kuch inappropriately touched Elizabeth W. on a near-daily basis in his technique class. She also witnessed classmates being touched in this manner by Kuch, Defendant Gain and Dianne Markham.

129.    Richard Kuch also pressured Elizabeth W. to spend time with him alone outside of class. He repeatedly invited her to come to his office, which she politely declined. He also invited Elizabeth W. to be a guest at The Farm, which was considered a "badge of honor." During her visit, Kuch provided alcohol to the underaged minors. Several students became drunk, including one classmate who lost consciousness.

130.    Later, Kuch taught Elizabeth W. in his improvisation class. Once, while Elizabeth W. was performing during class, Kuch loudly demanded that Elizabeth W. make her movements "more sexual." Further, he announced to the class that she obviously didn't

29

understand what a real sexual experience was and that she "needed to get fucked by a big, black man." Kuch then pointed to Boris, Elizabeth W.'s classmate who was African American, and told him to "help" her. Kuch then forced the two students to dance together seductively in front of the entire class.

131. At the completion of her sophomore year, Elizabeth W. was not invited to return to UNCSA. She believed the decision in part was because she had rebuffed Kuch's advances. Elizabeth W. was devastated. She auditioned again after completing the summer intensive and UNCSA readmitted her. However, she was forced to retake Kuch's technique class in the fall of 1986. Kuch again subjected her to the same sexual touching that she had been subjected to the prior year.

132. The remainder of her time at UNCSA Elizabeth W. felt isolated and alone. Kuch ignored her, and she felt abandoned and worthless. In 1988, Elizabeth W. started college at UNCSA because she felt she had no other choice. By then, her confidence had been completely shattered. She was convinced that she would never dance professionally and became suicidal. She dropped out of UNCSA after one semester of college, depressed and lacking direction. Eventually, she went to community college and transferred to Appalachian State University, but her mental health continued to deteriorate. She was diagnosed with major depressive disorder and an anxiety disorder. For decades, Elizabeth W. has struggled with suicidal ideation and depression, and she continues to take anti-depressants to help her manage her illness.

**FACTS SPECIFIC TO PLAINTIFF CHRISTOPHER SODERLUND**

133. In the summer of 1983, at age 15, Christopher attended summer school at UNCSA's high school and was admitted to the regular term of the high school beginning September 1983.

30

134.     Kuch and Gain were Christopher's dance teachers at UNCSA. Kuch was the assistant dean of the modern dance department. Gain was a faculty member in the modern dance department.

135.     Christopher was a ballet major. Duncan Noble was the assistant dean of the ballet department under the dean of the dance department, Robert Lindgren.

136.     In the winter of 1983 Christopher auditioned for and was chosen for the spring musical revue choreographed and directed by the Kuch and Gain.

137.     Kuch and Gain awed the impressionable young Christopher with their accomplishments, including having been Martha Graham dancers and Broadway performers. Gain boasted that he had performed with the Joffrey Ballet and the New York City Ballet.

138.     Kuch and Gain convinced Christopher that, based upon their contacts and reputation in the dance community, they could advance and promote the careers of their favored students, possibly him.

139.     Kuch and Gain also convinced Christopher that one bad word from them and he would not be able to find a job anywhere.

140.     Kuch and Gain, especially Gain, paid substantial attention to Christopher. They made him feel unique and talented, and thus gained Christopher's trust, respect, confidence and adoration. Gain developed a close, personal relationship with Christopher outside of the classroom, acting as a mentor, confidante and friend.

141.     Kuch and Gain told students, including Christopher, and even boys and girls as young as 13 that dancing was sexual expression and that they would be better dancers if they were sexually active.

31

142.     Kuch and Gain instructed many male dance students during Christopher's class that they could "loosen them up" by performing sexual acts with them, and, thereby, improve their performance and career chances.

143.     Prior to Easter 1984, when Christopher was only 16 years old, Gain took the impressionable young aspiring dancer to Kuch and Gain's house, where he served Christopher alcohol and then engaged in sexual relations with him.

144.     Gain repeated the seduction of Christopher on other occasions, during which Christopher detached himself emotionally, physically and intellectually from what was happening.

145.     Christopher trusted Gain, did not understand that what Gain was doing was wrong, feared losing Gain's friendship and guidance, and was afraid that if he resisted Gain that Kuch and Gain would retaliate by adversely affecting Christopher's grades, the performances in which he wished to participate, and his opportunity for a successful dance career.

Kuch was aware of and witnessed and assisted Gain's seduction of Christopher. Kuch assisted and encouraged Gain by serving Christopher alcohol and encouraging Christopher to engage in sexual acts with Gain.

146.     Kuch made sexual advances towards Christopher at "The Farm" and at the school.

147.     Kuch and Gain often graphically described to Christopher many other occasions in which they had had sexual relations with other male dance students, leading Christopher to believe that this was an acceptable practice.

148.     Kuch intentionally humiliated Christopher during classes and rehearsals making suggestive remarks to him in front of other students and by publicizing that Christopher and Gain were engaged in a sexual relationship.

32

149.     Christopher believed that if he did not submit to Kuch's abuse and harassment that he would retaliate by adversely affecting his grades, the performances in which he wished to participate, and his dreams for a successful dance career.

150.     As a result of Kuch and Gain's publication and public humiliation of Christopher, art students in Christopher's dormitory created graphic cartoons in the bathroom and showers depicting Kuch and Gain sodomizing him. The students mocked him by drawing blood and semen spewing out of Christopher's cartoon back side. The students used glue as the semen to create a three dimensional visual. It traumatized Christopher then and still does to this day.

151.     Arthur Ballard, a member of UNCSA's faculty, told Christopher that he knew of his sexual relationship with Gain. He never offered Christopher any assistance with regard to the abuse and exploitation being perpetrated by Kuch and Gain.

152.     During the spring performance of 1984, Kuch and Gain severed their sexual relationship with Christopher and, thereafter, belittled him. They convinced Christopher that he was unworthy of esteem both personally, physically and as a dancer.

153.     As a result of Kuch and Gains' ridicule, Christopher became emotionally unstable and began a cycle of self-destructive behavior which involved over-eating, drinking and smoking.

154.     In the spring of 1984, Christopher's academic grades were excellent. He went before the entire ballet faculty (called a "jury") for his artistic evaluation. His artistic evaluations were good and there was no indication from any of his teachers or members of the faculty that he would not be invited back for the regular fall term. UNCSA's custom and practice of inviting back the students who have high academic standing and pass the artistic jury evaluation created a

Case 1:21-cv-00859-CCE-JEP   Document 1-1   Filed 11/05/21   Page 53 of 77

reasonable expectation that Christopher would be invited back for the regular fall term. It was significant to Christopher's professional career that he complete his education at UNCSA.

155.    Near the end the school year in 1984, Duncan Noble, then the assistant dean of the ballet department, informed Christopher that he knew of Christopher's sexual relationship with Kuch and Gain.

156.    Noble did not use his position as an assistant dean to prevent further sexual abuse or to have Kuch and Gain disciplined or to assist Christopher with the abuse he was suffering.

157.    Instead, Noble told Christopher that he, too, thought he would have had sex with him by the end of the school year and told Christopher that he was not being invited back for the fall semester. Noble gave Christopher no further opportunity for a fair and reliable procedure to determine whether he was worthy of continuing as a student at UNCSA. His decision was arbitrary, capricious and tainted by his own conflict of interest.

158.    As a result of Kuch and Gains' abuse, exploitation, denigration, rejection and abandonment of Christopher, combined with the staff, faculty and administration's knowledge of and apparent and horrific tolerance of the violence being done to his body and soul, Christopher became emotionally vulnerable, he loathed and blamed himself, he felt worthless and began a cycle of self-destructive behavior which involved over-eating, drinking alcohol and smoking cigarettes.

159.    Christopher was distraught that he was not being invited back to the ballet department and he did not want to lose his opportunity for education at UNCSA.

160.    Christopher requested of Kuch and Gain that he be transferred to the modern dance department. Kuch reluctantly transferred him to the modern dance department for the summer semester, indicating that he would be under intense scrutiny.

34

During that summer school session, Kuch made sexual advances towards Christopher.

Christopher rebuffed all of his advances.

161.    Kuch and Gain continued to torment Christopher by flirting with him one moment and then in the next moment making disparaging comments about him being fat and unattractive. They compared him unfavorably to other male dancers. They indicated that the other boys were more attractive to them both as dancers and as sexual partners.

162.    Kuch and Gains' actions so upset Christopher that he contemplated suicide.

163.    Diane Markham, a teacher in the Modern Dance Department, knew of Gain's sexual relationship with Christopher. During the summer session of 1984, Christopher discussed with Markham the details of Kuch and Gain's scrutiny of him and their unjustified negative comparisons between him and other male dance students. Diane Markham did not indicate that there was anything wrong with Gain having had sex with Christopher, and she told Christopher that there was nothing she could do about Kuch and Gain's unjustified treatment of him in the department.

164.    Christopher reported what was happening to him to his dance teachers Mabel Robinson and Melinda Lawrence. He sought their comfort, compassion and care. The teachers indicated at various times to him words to the effect of: "The administration knows and does nothing. We can do nothing to help you." They also confirmed that Christopher would experience casting couches in the "real dance world."

165.    Because of the open sexual relationships between teachers and students at UNCSA and because of the failure of the school's agents, administrators and faculty members to report, investigate, discipline, bring charges against, express outrage to Kuch and Gain or any other teacher having sex with a student, or in any other way assist Christopher and other minor

35

students from sexual exploitation and seduction by faculty members, Christopher believed that such activity was an acceptable and normal part of studying at UNCSA.

166.    At the end of the summer session, Kuch refused to invite Christopher back to UNCSA for his junior year of high school. Kuch gave Christopher no opportunity to be judged by the faculty or any other fair and reliable procedure for determining whether he was worthy of continuing his education at UNCSA.

167.    Upon information and belief, Gain convinced Kuch not to invite Christopher back for the regular fall term. The actions of Gain were arbitrary, capricious and tainted by his conflict of interest.

168.    As a direct and proximate result of the actions of Kuch and Gain, Christopher continued his self-destructive behavior of drinking, smoking and over-eating.

169.    Christopher returned for a summer session of high school when he was 18 years old in 1986. He believed he needed to earn the respect and praise of Kuch and Gain.

170.    Kuch verbally abused Christopher and made comments to Christopher about being an "old flame." Gain did not speak to Christopher and acted as if nothing had ever happened.

171.    Christopher discussed with Gigi Buffington, a guest teacher in the Modern Dance Department and with Diane Markham the continuing abuse and harassment he suffered. Christopher explained to Ms. Buffington about Gain's prior sexual relationship with him. Neither Ms. Markham nor Ms. Buffington indicated that Gain's sexual relationship with the Christopher was wrong, nor did they offer Christopher any help.

36

## CLASS ACTION ALLEGATIONS

172.    Plaintiffs brings this action pursuant to Rule 23 of the North Carolina Rules of Civil Procedure, on behalf of themselves individually and on behalf of all other current and former students at the University of North Carolina School of the Arts who were victims of sexual abuse and/or exploitation by members of the faculty, staff and/or administration at the University of North Carolina School of the Arts while minor students attending that school and who were students entrusted to the purported oversight, care, safety and supervision of the faculty, staff and administration at the University of North Carolina School of the Arts.

173.    The named and unnamed members of the class have an interest in the same issues of fact and law, and these issues predominate over issues affecting only individual class members.

174.    The named Plaintiffs and the unnamed class members have an actual controversy with the Defendant former administrators.

175.    The named Plaintiffs and the unnamed class members have a genuine personal interest in the outcome of this litigation because they all suffered sexual abuse and exploitation as young students at UNCSA due to the negligence of the Defendant administrators who either knowingly permitting such egregious conduct to continue for an extended period of time or were willfully and wantonly negligence in failing to know of such egregious conduct.

176.    The named Plaintiffs and the unnamed class members have a genuine personal interest in the outcome of this litigation because they all suffered sexual abuse and exploitation as young students at UNCSA due to the deliberate indifference of Defendant UNCSA in knowingly permitting such egregious sexual abuse and exploitation to continue for an extended period of time or were willfully and wantonly negligence in failing to know of such egregious

37

conduct and by such actions and/or inactions deprived Plaintiffs and others similarly situated of their constitutional right to a sound, basic, abuse-free education.

177.    Because of the willful, wanton and/or gross negligence of the Defendant former administrators as alleged herein, the named Plaintiffs and the similarly situated unnamed class members have suffered physical, mental, emotional and psychological damage and the named Plaintiffs and the unnamed class members are each entitled to recover from the individual Defendant former administrators.

178.    Because of the willful, wanton deliberate indifference to the sexual abuse, exploitation and harassment of Defendant UNCSA as alleged herein, the named Plaintiffs and the similarly situated unnamed class members have suffered physical, mental, emotional and psychological damage and the named Plaintiffs and the unnamed class members are each entitled to recover from Defendant UNCSA.

179.    The named Plaintiffs will fairly and adequately represent the interest of all potential class members in that the named Plaintiff has a genuine, personal, substantial and direct interest in successfully pursing this case and are situated similarly to the unnamed class members with respect to his claims against UNCSA and UNC.  The named Plaintiffs are committed to prosecuting this action and has retained counsel competent and experienced in litigation involving claims of sexual abuse and exploitation. The named Plaintiffs will adequately represent members of the class located outside of North Carolina.

180.    There is no conflict of interest existing between the named Plaintiffs and any potential class members as to the issues raised in this action.

38

181.     There are several hundred potential class members; therefore, the class is so numerous that it is impractical to bring them all before the Court except pursuant to a Rule 23 class action designation or certification.

182.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

183.     For the reasons stated above, proceeding as a class action will provide a fair and efficient adjudication of this controversy without the need for a multiplicity of lawsuits. This matter should proceed as a class action.

184.     The former administrator Defendants are not immune from this suit or the relief sought hereunder by any claim of sovereign/governmental immunity.

185.     Defendant UNCSA is not immune from this suit or the relief sought hereunder by any claim of sovereign/governmental immunity.

### CLAIMS AGAINST THE FORMER UNCSA ADMINISTRATORS NAMED INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITIES

### FIRST CLAIM FOR RELIEF:
### NEGLIGENCE and NEGLIGENT RETENTION AND/OR SUPERVISION AGAINST DEFENDANTS MILLEY, SMITH, DODSON, TRIBBY, MARKHAM and RUST

186.     Plaintiffs refer to and hereby reallege and incorporate by reference all previous paragraphs of this Complaint.

187.     Defendants Milley, Smith, Dodson, Tribby, Markham and Rust, when they knew and/or should have known of the culture of sexual abuse and exploitation that permeated life at

39

UNCSA, had a duty to take the reasonable and necessary actions to protect Plaintiffs from foreseeable harm when Plaintiffs were in their care, custody, control and under their supervision as minor students attending UNCSA.

188.    When hiring and/or retaining and/or utilizing and/or supervising employees, agents, faculty members and/or representatives of UNCSA, Defendants Milley, Smith, Dodson, Tribby, Markham and Rust -- when they knew and/or should have known of the culture of sexual abuse and exploitation that permeated life at UNCSA -- owed Plaintiffs a duty to act as an ordinary, prudent and reasonable employer and/or supervisor of the faculty, staff and administrators with whom Plaintiffs and other students would be interacting and relying upon for a safe and protected environment in which Plaintiffs and other students could learn and grow.

189.    Defendants Milley, Smith, Dodson, Tribby, Markham and Rust -- when they knew and/or should have known of the culture of sexual abuse and exploitation that permeated life at UNCSA -- had a duty and an obligation to take reasonable actions to prevent any and all members of UNCSA's faculty and staff and any of its administrators from using the tasks, premises, job title, job responsibilities and/or the instrumentalities of his/her position to target, groom, and/or sexually abuse and exploit students in their care and entrusted to them, including Plaintiffs.

190.    Defendants Milley, Smith, Dodson, Tribby, Markham and Rust -- when they knew and/or should have known of the culture of sexual abuse and exploitation that permeated life at UNCSA -- had a duty to have in place policies and procedures that would prohibit adult faculty, staff and administrators from engaging in any form of sexual contact with any student at the school, specifically including Plaintiffs.  Defendants Milley, Smith, Dodson, Tribby,

40

Markham and Rust had a further duty and obligation to see that those policies and procedures were implemented, followed and enforced.

191.    Defendants Milley, Smith, Dodson, Tribby, Markham and Rust -- when they knew and/or should have known of the culture of sexual abuse and exploitation that permeated life at UNCSA -- had a duty to have in place policies and procedures that would prohibit adult faculty, staff and administrators from engaging in any type, kind and/or form of sexual abuse or exploitation of at the school. Defendants Milley, Smith, Dodson, Tribby, Markham and Rust had a further duty and obligation to see that those policies and procedures were implemented, followed and enforced.

192.    Defendants Milley, Smith, Dodson, Tribby, Markham and Rust -- when they knew and/or should have known of the culture of sexual abuse and exploitation that permeated life at UNCSA -- had a duty to have in place policies and procedures that would prohibit adult faculty, staff and administrators from engaging in any type, kind and/or form of sexual abuse or exploitation of at the school. Defendants Milley, Smith, Dodson, Tribby, Markham and Rust had a further duty and obligation to see that those policies and procedures were implemented, followed and enforced.

193.    Defendant Milley, Smith, Dodson, Tribby, Markham and Rust negligently and recklessly breached each of their foregoing duties by failing to exercise reasonable care and by failing to take any action of any kind to prevent UNCSA's faculty, staff and administrators from engaging in sexual contact with and/or sexually abusing and/or exploiting the students entrusted to their care and supervision, including breaching this duty as to Plaintiffs.

194.    Defendants Milley, Smith, Dodson, Tribby, Markham and Rust by acting and/or failing to act when they knew and/or should have known of the culture of sexual abuse and

41

exploitation that permeated life at UNCSA negligently and recklessly breached each of their foregoing duties by participating in, condoning and/or encouraging an institutional culture that permitted sexual abuse and exploitation of the students entrusted to their care and supervision, including Plaintiffs.

195.    In breaching their duties Defendants Milley, Smith, Dodson, Tribby, Markham and Rust failed to create a safe and secure environment for Plaintiffs and other students entrusted to its supervision and in their care, custody, and control, and instead created, allowed, ignored and/or perpetuated a dangerous culture and environment that ignored, condoned and/or encouraged sexual abuse and exploitation of UNCSA's students. In breaching these duties, Defendants Milley, Smith, Dodson, Tribby, Markham and Rust created a real and foreseeable risk that Plaintiffs and other minor students at UNCSA would be sexually abused and/or exploited.

196.    As a direct and proximate result of the above-described negligence of Defendants Milley, Smith, Dodson, Tribby, Markham and Rust, Plaintiffs have suffered and continue to suffer physical, mental and emotional injuries and has incurred and continues to incur medical and other expenses and have incurred a loss of wages and income and suffered a loss of earning capacity causing her to continue to incur lost earnings in the future and the inability to earn wages at his full potential all damages in an amount to be determined by a jury, but in any event, in an amount in excess of twenty-five thousand dollars ($25,000.00).

## SECOND CLAIM FOR RELIEF:
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
## AGAINST ALL DEFENDANTS

197.    Plaintiffs refer to and hereby reallege and incorporate by reference all previous paragraphs of this Complaint.

42

198.    As alleged above, Defendants' actions and/or failures to act related to Plaintiffs were negligent.

199.    These negligent acts or failures to act did, in fact, cause Plaintiffs severe emotional distress.

200.    Defendants knew or should have known, and it was reasonably foreseeable that, Defendants' acts and/or failures to act would cause Plaintiffs severe emotional distress.

201.    Defendants knew or should have known and it was reasonably foreseeable that their failure to properly supervise and to intervene and stop the sexual abuse and exploitation of its students, including Plaintiffs, when it was or should have been clear that such harmful conduct was occurring and would cause Plaintiffs severe emotional distress.

202.    As a result of Defendants' negligent acts and/or failures to act, Plaintiffs have sought professional medical treatment.

203.    As a proximate and foreseeable result of the negligence of Defendants as alleged herein, Plaintiffs endured pain, suffering, mental anguish, and suffered from severe emotional distress and will continue to endure pain, suffering, mental anguish, and suffer from severe emotional distress in the future.

204.    As a direct and proximate result of the above-described negligence of Defendants, Plaintiffs have suffered and continue to suffer physical, mental and emotional injuries and have incurred and continue to incur medical and other expenses and Plaintiffs have incurred a loss of wages and income and suffered a loss of earning capacity causing them to continue to incur lost earnings in the future and the inability to earn wages at his full potential all damages  in an amount in excess of twenty-five thousand dollars ($25,000.00).

43

## THIRD CLAIM FOR RELIEF:
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## AGAINST DEFENDANT GAIN

205. Plaintiffs refer to and hereby reallege and incorporate by reference all previous paragraphs of this Complaint.

206. Defendant Gain engaged in conduct rising to the level of intentional infliction of emotional distress against Plaintiffs, in that he:

    a.    engaged in conduct which a reasonable prudent person would find extreme and outrageous;

    b.    engaged in conduct amounting to extreme and outrageous conduct with the specific intent to cause severe emotional distress to another person;

    c.    engaged in conduct amounting to extreme and outrageous conduct which he knew or should have known would cause another person severe emotional distress;

    d.    engaged in conduct amounting to extreme and outrageous conduct that caused another person to suffer severe and emotional distress;

    e.    engaged in conduct not set out herein which may be revealed in discovery; and engaged in conduct rising to the level of severe infliction of emotional distress in other and further ways as the evidence will show and to be proven at trial.

207. The conduct of the Defendant Gain, as specifically alleged above, constitutes extreme and outrageous conduct which caused Plaintiffs severe emotional distress or otherwise indicated a reckless indifference to the likelihood that such conduct would cause severe emotional distress to Plaintiffs.

44

208.    The acts and/or omissions of Defendant Gain as alleged herein were willful and wanton and exhibited a conscious disregard of and indifference to the rights and safety of Plaintiffs and of its duties to him.

209.    As a result of Defendant Gain's extreme and outrageous conduct, Plaintiffs have sought professional medical treatment.

210.    As a direct and proximate result of the above-described conduct of Defendant Gain, Plaintiffs have suffered and continue to suffer physical, mental and emotional injuries and have incurred and continue to incur medical and other expenses and Plaintiffs have incurred a loss of wages and income and suffered a loss of earning capacity causing them to continue to incur lost earnings in the future and the inability to earn wages at his full potential all damages in an amount in excess of twenty-five thousand dollars ($25,000.00).

## FOURTH CLAIM FOR RELIEF:
## BATTERY AGAINST DEFENDANT GAIN

211.    Plaintiffs refer to and hereby reallege and incorporate by reference all previous paragraphs of this Complaint.

212.    Defendant Gain's conduct as alleged above constitutes a battery upon Plaintiffs, in that he intentionally and in wanton disregard for the safety and well-being of Plaintiffs and without consent touched Plaintiffs in a harmful and offensive way.

213.    As a direct and proximate result of the above-described conduct of Defendant Gain, Plaintiffs have suffered and continue to suffer physical, mental and emotional injuries and have incurred and continue to incur medical and other expenses and Plaintiffs have incurred a loss of wages and income and suffered a loss of earning capacity causing them to continue to

incur lost earnings in the future and the inability to earn wages at his full potential all damages in an amount in excess of twenty-five thousand dollars ($25,000.00).

## FIFTH CLAIM FOR RELIEF:
## PUNITIVE DAMAGES AGAINST ALL DEFENDANTS

214. Plaintiffs refer to and hereby reallege and incorporate by reference all previous paragraphs of this Complaint.

215. The conduct of the Defendants fully set forth herein was willful, wanton and/or reckless and done in conscious and flagrant disregard of and indifference to the rights and safety of the students under the care and supervision of UNCSA, specifically including the rights and safety of Plaintiffs.

216. As a result of this willful, wanton and/or reckless conduct and misconduct by the Defendants, the Defendants are liable to Plaintiffs for punitive damages.

217. The amount of punitive damages to be assessed by the jury against each Defendant should be an amount sufficient to deter each Defendant from such willful and wanton conduct in the future and to deter others similarly situated from engaging in such willful, wanton and reckless behavior.

## CLAIMS AGAINST UNCSA

## FIRST CLAIM FOR RELIEF:
## VIOLATION OF ARTICLE I, SECTION 15 AND ARTICLE IX, SECTION 2
## OF THE NORTH CAROLINA CONSTITUTION

218. Plaintiffs refer to and hereby reallege and incorporate by reference all previous paragraphs of this Complaint.

46

219.    Article I, Section 15 and Article IX, Section 2 of the North Carolina State Constitution jointly guarantee every child the right to a "sound basic education." *Leandro v. North Carolina,* 346 N.C. 336 (1997).

220.    Article I, Section 15 of the North Carolina Constitution placed an affirmative duty on Defendant UNCSA "to guard and maintain that right." N.C. Const. art. I, § 15.

221.    Taken together, Article I, Section 15 and Article IX, Section 2 of the North Carolina Constitution required that Defendant UNCSA to provide the minor students under its care and supervision an opportunity to learn that was free from continual sexual intimidation, abuse, exploitation and harassment.

222.    Due to its willful and deliberate indifference to the sexual intimidation, abuse, exploitation and harassment being perpetrated upon Plaintiffs and others similarly situated, Defendant UNCSA failed in its constitutional duty and obligation to provide a safe environment where Plaintiffs and others similarly situated could learn and grow.

223.    Due to its willful and deliberate indifference to the sexual intimidation, abuse, exploitation and harassment being perpetrated upon Plaintiffs and others similarly situated, Defendant UNCSA failed in its constitutional duty and obligation to prepare Plaintiffs and others similarly situated to participate and compete in the society in which they would live and work.

224.    Defendant UNCSA knew about the sexual intimidation, abuse, exploitation and harassment being perpetrated upon Plaintiffs and that was infringing the Plaintiff-students' constitutional right and failed to take any action to this egregious and outrageous conduct.

225.    The named Plaintiffs and the unnamed members of the class were all minor students whose care, safety and supervision was entrusted to and an obligation of Defendant UNCSA.

47

226. The named Plaintiffs and the unnamed members of the class were each denied their individual right to a sound basic education as guaranteed by the North Carolina Constitution as a result of being in a hostile environment where sexual abuse and exploitation of minor students was ignored and condoned and Defendant UNCSA's deliberate indifference to that egregious, outrageous and harmful conduct.

227. The named Plaintiffs and the unnamed members of the class were each were subjected to egregious and unconscionable verbal and physical sexual harassment and exploitation while under the purported trust, care and supervision of Defendant UNCSA.

228. Defendant UNCSA had substantial control over the abusive and exploitative sexual conduct.

229. The abusive and exploitative sexual conduct was severe and discriminatory. Defendant UNCSA, by and through its employees, agents and administrators had actual knowledge of the abusive and exploitative sexual conduct.

230. Defendant UNCSA exhibited willful and deliberate indifference to the sexually abusive, exploitative and harassing conduct.

231. The academic performance of and the personal lives of the named Plaintiffs and the unnamed members of the class suffered greatly as a result of the perpetually chaotic school environment created by the pervasive sexual abuse and exploitation that Defendant UNCSA permitted and condoned and the then-minor Plaintiffs each suffered substantially adverse educational consequences.

232. Despite the actual knowledge of the pervasive sexual abuse and exploitation of its minor students, Defendant UNCSA exhibited deliberate indifference to the abusive and

48

exploitative conduct and the horrible impact it would have on the minor students forced to endure it.

233.    As a direct and proximate result of the above-described actions and/or failures to act of Defendant UNCSA, the named Plaintiffs and the unnamed members of the class have suffered and continue to suffer physical, mental and emotional injuries and have incurred and continues to incur medical and other expenses and have incurred a loss of wages and income and suffered a loss of earning capacity causing her to continue to incur lost earnings in the future and the inability to earn wages at his full potential all damages in an amount to be determined by a jury, but in any event, in an amount in excess of twenty-five thousand dollars ($25,000.00).

## SECOND CLAIM FOR RELIEF:
## PUNITIVE DAMAGES

234.    Plaintiffs refer to and hereby reallege and incorporate by reference all previous paragraphs of this Complaint.

235.    The conduct of Defendant UNCSA as fully set forth herein was willful, wanton and/or reckless and done in conscious and flagrant disregard of and indifference to the rights and safety of the students under the care and supervision of UNCSA, specifically including the rights and safety of the named Plaintiffs and the unnamed class members.

236.    As a result of this willful, wanton and/or reckless conduct and misconduct of Defendant UNCSA, Defendant is liable to named Plaintiffs and the unnamed class members for punitive damages.

237.    The amount of punitive damages to be assessed by the jury against Defendant UNCSA should be an amount sufficient to punish Defendant UNCSA and to deter Defendant UNCSA from such willful and wanton conduct in the future and to deter others similarly situated from engaging in such willful, wanton and reckless behavior.

49

**The named Plaintiffs and the unnamed class members respectfully request a trial by jury on all issues of fact so triable.**

WHEREFORE, Plaintiffs respectfully pray the Court as follows:

1.  That the named Plaintiffs and the unnamed members of the class have and recover of the individual Defendants, jointly and severally, an amount to be determined by a jury and in excess of the jurisdictional limit of this Court as provided by law;

2.  That the named Plaintiffs and the unnamed members of the class have and recover of Defendant UNCSA an amount to be determined by a jury and in excess of the jurisdictional limit of this Court as provided by law;

3.  That Plaintiffs individually each have and recover from the individual Defendants punitive damages as allowed by law and determined by a jury;

4.  That Plaintiffs individually each have and recover from Defendant UNCSA punitive damages as allowed by law and determined by a jury;

5.  That Plaintiff be awarded pre-judgment interest as by law allowed beginning from the date of the filing of this action;

6.  That Plaintiffs be awarded attorney's fees and costs as allowed by law; and

7.  For all such other and further relief as the Court may deem just and proper.

50

This the ___29th___ day of September, 2021.

LANIER LAW GROUP, P.A.

_____
Lisa Lanier
N.C. State Bar No.: 19119
Donald S. Higley, II
NC State Bar No.: 20814
Robert O. Jenkins
N.C. State Bar No.: 19102
6518 Airport Center Drive
Greensboro, NC 27409
Tel:    336-506-1041
Fax:    866-905-8741
llanier@lanierlawgroup.com
dhigley@lanierlawgroup.com
rjenkins@lanierlawgroup.com

For NCRCP 5 email service please use:
**service @lanierlawgroup.com**

Gloria R. Allred
CA Bar No. 65033
Nathan Goldberg
CA Bar No. 61292
Renee Mochkatel
CA Bar No. 106049
**ALLRED, MAROKO & GOLDBERG**
Wilshire Boulevard, Suite 1500
Los Angeles, CA 90048
Tel: 323-653-6530
Fax: 323-653-1660
gallred@amglaw.com
ngoldberg@amglaw.com
rmochkatel@amglaw.com
_Appearing Pro Hac Vice – Motions Pending_

_Attorneys for Plaintiff_

File Number: __21 CVS 4831__

Plaintiff (Payor): __Alloways-Ramsey, Christopher__

Total: **$225**

Clerk: **BLM**

*Pro Hac Vice*

### Flag for VCAP = YES

### Flag for VCAP = NO

---

**FILING FEES: (original/counterclaim/cross-claim)**

| | | |
|---|---|---|
| ☐ CVSC | Superior | $200.00 |
| ☐ CVDC | District | $150.00 |
| ☐ CVMC | Small Claims | $ 96.00 |
| ☐ CVM1 (23321) Kernersville | | $ 96.00 |
| ☐ CVAC | Small Claims Appeal | $146.00 |

### Flag for VCAP = NO

### SUMMARY EJECTMENT
### RENT BOND (26220)

**DEFENDANT NAME:** _____

**ARREARS:** _____

**RENT AMOUNT:** _____

**MISCELLANEOUS FEES:**

☐ ARBITRATION/
TRIAL DE NOVO      24311 _____

☐ M #'s FILING FEE
(CLOL, LISP, LIENS)  21435 _____

☐ DISTRICT FACILITY
☐ FEE                  22220_____

☐ SUPERIOR FACILITY
FEE                    22120_____

| | | | |
|---|---|---|---|
| ☐ CDDC Divorce/Disp. Home | | $ | 225.00 |
| ☐ CASH BOND | 26210 | $ | _____ |
| SPECIFY: _____ | | | |
| ☐ POSTAGE | 24660 | $ | _____ |
| ☐ TRANSCRIPT FEE | 21440 | $ | _____ |
| ☐ WRIT OF EXECUTION POSSESSION | 21430 | $ | _____ |
| ☐ LIMITED DRIVING PRIV | 24335 | $ | _____ |
| ☐ A&P / ENDORSEMENT | 21455 | $ | _____ |
| ☐ MOTION/NOTICE OF HEARING | 21450 | $ | _____ |
| ☐ SURPLUS FUNDS/ DEPOSIT PAYABLE | 26600 | $ | _____ |
| ☐ REGISTRATION FEE SUPPLEMENTAL PROCEEDING CONFESS JUDGMENT | 21400 | $ | _____ |
| ☐ CONDEMNATION | 26130 | $ | _____ |
| ☐ COPY | 21410 | $ | _____ |
| ☐ OUT OF STATE ATTY FILING FEES | 24626 24625 | $ $ | 25.00 200.00 |
| ☐ BUSINESS COURT | 21122 | $ | 1,100.00 |

## Forsyth County Clerk of Superior Court
## CIVIL RECEIPTING

File Number: 21CV54831

Total: $225

Clerk: BLM

Plaintiff (Payor): Alloways-Ramsey, Christopher

Pro Hac Vice

### Flag for VCAP = YES

### Flag for VCAP = NO

---

**FILING FEES: (original/counterclaim/cross-claim)**

☐ CVSC  Superior              $200.00

☐ CVDC  District              $150.00

☐ CVMC  Small Claims          $ 96.00

    ☐ CVM1 (23321) Kernersville   $ 96.00

☐ CVAC  Small Claims Appeal   $146.00

### Flag for VCAP = NO

### SUMMARY EJECTMENT
### RENT BOND (26220)

DEFENDANT NAME: _____

ARREARS: _____

RENT AMOUNT:

**MISCELLANEOUS FEES:**

☐ ARBITRATION/
TRIAL DE NOVO       24311 _____

☐ M #'s FILING FEE
(CLOL, LISP, LIENS)  21435 _____

☐ DISTRICT FACILITY
☐ FEE                22220 _____

☐ SUPERIOR FACILITY
FEE                  22120 _____

☐ CDDC Divorce/Disp. Home    $ 225.00

☐ CASH BOND          26210  $ _____

SPECIFY: _____

☐ POSTAGE            24660  $ _____

☐ TRANSCRIPT FEE     21440  $ _____

☐ WRIT OF EXECUTION  21430  $ _____
POSSESSION

☐ LIMITED DRIVING PRIV 24335 $ _____

☐ A&P / ENDORSEMENT  21455  $ _____

☐ MOTION/NOTICE OF
HEARING              21450  $ _____

☐ SURPLUS FUNDS/
DEPOSIT PAYABLE      26600  $ _____

☐ REGISTRATION FEE   21400  $ _____
SUPPLEMENTAL PROCEEDING
CONFESS JUDGMENT

☐ CONDEMNATION       26130  $ _____

☐ COPY               21410  $ _____

☒ OUT OF STATE ATTY  24626  $   25.00
FILING FEES          24625  $  200.00

☐ BUSINESS COURT     21122  $ 1,100.00

File Number: _21 CVS 4831_

Total: **$225**

Clerk: **TBLM**

Plaintiff (Payor): _Alloways-Ramsey, Christopher_

Pro Hac Vice

**Flag for VCAP = YES**          **Flag for VCAP = NO**

---

**FILING FEES:** (original/counterclaim/cross-claim)

☐ CVSC   Superior              $200.00

☐ CVDC   District              $150.00

☐ CVMC   Small Claims          $ 96.00

    ☐ CVM1 (23321) Kernersville   $ 96.00

☐ CVAC   Small Claims Appeal   $146.00

**Flag for VCAP = NO**

**SUMMARY EJECTMENT**
**RENT BOND (26220)**

DEFENDANT NAME: _____

ARREARS: _____

RENT AMOUNT:

**MISCELLANEOUS FEES:**

☐ ARBITRATION/
   TRIAL DE NOVO      24311 _____

☐ M #'s FILING FEE
   (CLOL, LISP, LIENS)  21435 _____

☐ DISTRICT FACILITY
☐ FEE                22220 _____

☐ SUPERIOR FACILITY
   FEE                22120 _____

☐ CDDC Divorce/Disp. Home    $  225.00

☐ CASH BOND          26210  $ _____

   SPECIFY: _____

☐ POSTAGE            24660  $ _____

☐ TRANSCRIPT FEE     21440  $ _____

☐ WRIT OF EXECUTION  21430  $ _____
   POSSESSION

☐ LIMITED DRIVING PRIV 24335 $ _____

☐ A&P / ENDORSEMENT  21455  $ _____

☐ MOTION/NOTICE OF
   HEARING            21450  $ _____

☐ SURPLUS FUNDS/
   DEPOSIT PAYABLE    26600  $ _____

☐ REGISTRATION FEE   21400  $ _____
   SUPPLEMENTAL PROCEEDING
   CONFESS JUDGMENT

☐ CONDEMNATION       26130  $ _____

☐ COPY               21410  $ _____

☑ OUT OF STATE ATTY  24626  $   25.00
   FILING FEES          24625  $  200.00

☐ BUSINESS COURT     21122  $ 1,100.00

File Number: _21 CVS 4831_

Plaintiff (Payor): _Ramsey, Christopher_

Total: _$200_

Clerk: _BLM_

## Flag for VCAP = YES

## Flag for VCAP = NO

**FILING FEES: (original/counterclaim/cross-claim)**

| | | |
|---|---|---|
| ☑ CVSC | Superior | $200.00 |
| ☐ CVDC | District | $150.00 |
| ☐ CVMC | Small Claims | $ 96.00 |
| ☐ CVM1 (23321) Kernersville | | $ 96.00 |
| ☐ CVAC | Small Claims Appeal | $146.00 |

## Flag for VCAP = NO

## SUMMARY EJECTMENT
## RENT BOND (26220)

DEFENDANT NAME: _____

ARREARS: _____

RENT AMOUNT:

**MISCELLANEOUS FEES:**

☐ ARBITRATION/
TRIAL DE NOVO    24311_____

☐ M #'s FILING FEE
(CLOL, LISP, LIENS)  21435_____

☐ DISTRICT FACILITY
☐ FEE              22220_____

☐ SUPERIOR FACILITY
FEE                22120_____

☐ CDDC Divorce/Disp. Home      $  225.00

☐ CASH BOND          26210 $_____

SPECIFY: _____

☐ POSTAGE            24660 $_____

☐ TRANSCRIPT FEE     21440 $_____

☐ WRIT OF EXECUTION  21430 $_____
POSSESSION

☐ LIMITED DRIVING PRIV 24335 $_____

☐ A&P / ENDORSEMENT  21455 $_____

☐ MOTION/NOTICE OF
HEARING            21450 $_____

☐ SURPLUS FUNDS/
DEPOSIT PAYABLE    26600 $_____

☐ REGISTRATION FEE   21400 $_____
SUPPLEMENTAL PROCEEDING
CONFESS JUDGMENT

☐ CONDEMNATION       26130 $_____

☐ COPY               21410 $_____

☐ OUT OF STATE ATTY  24626 $   25.00
FILING FEES          24625 $  200.00

☐ BUSINESS COURT     21122 $1,100.00

# STATE OF NORTH CAROLINA

_____ FORSYTH _____ County

File No. 21-CVS- **4831**

In The General Court Of Justice
☐ District  ☒ Superior Court Division

| | |
|---|---|
| *Name Of Plaintiff*<br>Christopher Alloways-Ramsey, et al. | |
| *Address*<br>c/o Lanier Law Group, P.A. 6518 Airport Center Drive | **CIVIL SUMMONS** |
| *City, State, Zip*<br>Greensboro               NC      27409 | ☐ **ALIAS AND PLURIES SUMMONS (ASSESS FEE)** |

**VERSUS**

G.S. 1A-1, Rules 3 and 4

| | |
|---|---|
| *Name Of Defendant(s)*<br>Jane Elizabeth Milley, individually and in her official capacity, et. al. | *Date Original Summons Issued* |
| | *Date(s) Subsequent Summons(es) Issued* |

**To Each Of The Defendant(s) Named Below:**

| *Name And Address Of Defendant 1*<br>Richard Gain<br><br>3228 Hauser Road<br>East Bend            NC      27018 | *Name And Address Of Defendant 2*<br>University of North Carolina School of the Arts<br>(FKA North Carolina School of the Arts)<br>c/o Chancellor Brian Cole<br>P.O. Box 12189, Winston-Salem      NC      27117-2189 |
|---|---|

⚠ **IMPORTANT! You have been sued! These papers are legal documents, DO NOT throw these papers out!
You have to respond within 30 days. You may want to talk with a lawyer about your case as soon as
possible, and, if needed, speak with someone who reads English and can translate these papers!**

**¡IMPORTANTE! ¡Se ha entablado un proceso civil en su contra! Estos papeles son documentos legales.
¡NO TIRE estos papeles!
Tiene que contestar a más tardar en 30 días. ¡Puede querer consultar con un abogado lo antes posible
acerca de su caso y, de ser necesario, hablar con alguien que lea inglés y que pueda traducir estos
documentos!**

*Served with motion for Admission
Pro Hac Vice.*

**A Civil Action Has Been Commenced Against You!**

You are notified to appear and answer the complaint of the plaintiff as follows:

1.  Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been
    served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2.  File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| *Name And Address Of Plaintiff's Attorney (if none, Address Of Plaintiff)*<br>Lisa Lanier<br>Lanier Law Group, P.A.<br>6518 Airport Center Drive<br>Greensboro            NC      27409 | *Date Issued*<br>9-29-2021 | *Time*<br>10:51  ☒ AM  ☐ PM |
|---|---|---|
| | *Signature* | |
| | ☒ Deputy CSC    ☐ Assistant CSC    ☐ Clerk Of Superior Court | |

| ☐ **ENDORSEMENT (ASSESS FEE)**<br>This Summons was originally issued on the date indicated<br>above and returned not served. At the request of the plaintiff,<br>the time within which this Summons must be served is<br>extended sixty (60) days. | *Date Of Endorsement* | *Time*<br>☐ AM  ☐ PM |
|---|---|---|
| | *Signature* | |
| | ☐ Deputy CSC    ☐ Assistant CSC    ☐ Clerk Of Superior Court | |

**NOTE TO PARTIES:** *Many counties have **MANDATORY ARBITRATION** programs in which most cases where the amount in controversy is $25,000 or
less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if
so, what procedure is to be followed.*

(Over)

AOC-CV-100, Rev. 4/18
© 2018 Administrative Office of the Courts

## RETURN OF SERVICE

I certify that this Summons and a copy of the complaint were received and served as follows:

### DEFENDANT 1

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|
| | | | |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

### DEFENDANT 2

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|
| | | | |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

| Service Fee Paid $ | Signature Of Deputy Sheriff Making Return |
|---|---|
| Date Received | Name Of Sheriff (type or print) |
| Date Of Return | County Of Sheriff |

AOC-CV-100, Side Two, Rev. 4/18
© 2018 Administrative Office of the Courts